## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND v. LEONARD JULES KERPELMAN

[Misc. Docket (Subtitle BV) No. 1, September Term, 1979.]

*Decided September 5, 1980.*

342

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*J. Martin McDonough, Jr., Special Assistant Bar Counsel,* for Attorney Grievance Commission.

*Leonard J. Kerpelman,* in proper person, respondent.

SMITH, J., delivered the opinion of the Court.

Pursuant to Maryland Rule BV 9, the Attorney Grievance Commission acting through Bar Counsel filed a petition with us praying that disciplinary action be taken against Leonard Jules Kerpelman, a member of the Bar of this State. The complaint grew out of his representation of three individuals. Those relative to one individual ultimately were dropped. The disciplinary rules involved in the two remaining complaints were DR 1-102(A)(1), (4), (5), and (6); 2-106(A); 2-110(A)(2) and (B)(4); 6-101(A)(2) and (3); 7-102(A)(7); and 7-106(A). Pursuant to Rule BV9 b we designated the Honorable Marshall A. Levin, an associate judge of the Eighth Judicial Circuit of Maryland, to hear the charges. After extensive and protracted hearings, he submitted a comprehensive report to us in which he found clear and convincing evidence of violation of DR 1-102(A)(1), (4), (5) and (6); DR 7-102(A)(7); and DR 7-106(A).[1] We agree.

---

1. These latter disciplinary rules state in pertinent part:
DR 1-102 Misconduct.
(A) A lawyer shall not:
 (1) Violate a Disciplinary Rule.
 * * *
 (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
 (5) Engage in conduct that is prejudicial to the administration of justice.
 (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

We shall set forth the charges against Kerpelman together with the gist of the trial judge's findings on those charges. We shall then consider the exceptions of Bar Counsel and each of Kerpelman's forty-four exceptions. Then we shall discuss the applicable law and the appropriate sanction to be imposed. In an effort to provide a clear understanding of this matter, we set forth in an appendix that portion of the trial judge's opinion which concerns the facts adduced before him.

## I The Malcomb matter

Bar Counsel alleged that in December 1975 John D. Malcomb sought the professional assistance of Kerpelman in regaining the custody of one of Malcomb's two children (Malcomb's other child then being in his custody); that Malcomb was advised that it would cost him $1,000 plus court costs for Kerpelman to represent him; that on or about December 17, 1975, Malcomb paid Kerpelman $500; that a second $500 was paid before the scheduled hearing on June 8, 1976; that between December 1975 and June 1976 Malcomb advised Kerpelman by letter of the names of witnesses he believed could materially contribute to the case and should be interviewed; that during this period he notified Kerpelman of the facts of the case; that during this same period Kerpelman granted Malcomb only one forty to forty-five minute interview during which time Kerpelman "indicated a lack of familiarity with the facts and issues of the action"; that Kerpelman recommended to Malcomb the hiring of a private social worker to do an investigation of Malcomb for use at the custody hearing at a cost of $350, but,

---

DR 7-102 Representing a Client Within the Bounds of the Law.
(A) In his representation of a client, a lawyer shall not:
 * * *
 (7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.
DR 7-106 Trial Conduct.
(A) A lawyer shall not disregard or advise his client to disregard a standing rule of a tribunal or a ruling of a tribunal made in the course of a proceeding, but he may take appropriate steps in good faith to test the validity of such rule or ruling.

"at the time of trial, after her qualifications were presented to the Court, her report and its conclusions were ruled inadmissible by the Court"; that prior to the date of trial Kerpelman interviewed only one of the witnesses concerning whom Malcomb had previously advised him; that by his interrogation of witnesses at trial Kerpelman "indicated a lack of familiarity with the facts and issues of the action"; that at the conclusion of the custody hearing on June 8, 1976, the chancellor reserved his ruling; that on or about June 23, 1976, Kerpelman "sent a bill to Malcomb for a 'Further retainer' in the amount of $650"; that upon receipt of that bill Malcomb paid Kerpelman $50; that when subsequent to the hearing Malcomb was unsuccessful in making contact with Kerpelman he "contacted his former wife and her attorney, during the week of July 20, 1976, and learned that the Court had reached a decision based upon the hearing of June 8, 1976, which decision Malcomb found acceptable to him, in that one child was awarded to Malcomb, and the other to Malcomb's former wife, with the requirement that Malcomb pay $25 per week in support for the child awarded to his former wife"; that on or about July 27 Malcomb "encountered [Kerpelman] at a meeting of a group called Fathers United, at which time [Kerpelman] indicated to Malcomb that the Court had not yet reached a final determination on the custody issue, and that [Kerpelman] was still working on the matter on Malcomb's behalf"; that on or about July 28, 1976, Malcomb ascertained from the chancellor that he had in fact rendered a decision on the custody issue on July 20, 1976; that Malcomb telephoned Kerpelman on about July 28, 1976, to tell him of the information he had acquired from the trial judge at which time Kerpelman "again told Malcomb that the matter had not been settled;" that on or about July 29, 1976, "Malcomb notified [Kerpelman] by letter that he was terminating their relationship, after which [Kerpelman] continued to correspond with Malcomb, and with the Court on Malcomb's behalf"; that on or about August 26, 1976, Kerpelman "submitted another bill to Malcomb for an additional $1,250, reflecting an 'Additional final fee based

on successful result,' resulting in a total additional claim of $1,850"; that on or about October 4, 1976, Kerpelman sued Malcomb claiming $1,850 "for services rendered by [Kerpelman]"; that on or about October 29, 1976, Kerpelman "submitted a third additional bill to Malcomb for an additional $1,000 for 'Re-analyzation of file, further additional fee based on time expended,' resulting in a total additional claim of $2,250"; that on or about February 11, 1977, Kerpelman amended his claim for damages in his suit against Malcomb "to $4,262, reflecting a total claim of $5,312, less the $1,050 previously paid by Malcomb"; and on or about March 21, 1977, Kerpelman "submitted a fourth additional bill for $4,262 as a 'Corrected bill based on final analysis done in January, 1977.'"

It was claimed, based on these allegations, that Kerpelman had violated DR 1-102(A)(1), (4), (5), and (6); DR 2-106(A); DR 2-110(A)(2) and (B)(4); and DR 6-101(A)(2) and (3).[2] The charges concerning neglect and excessive fees ultimately were dropped.

---

2. The disciplinary rules here involved which were not quoted in n. 1 state in pertinent part:

DR 2-106 Fees for Legal Services.
(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
DR 2-110 Withdrawal from Employment.
(A) In general.
* * *
 (2) In any event, a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules.
 * * *
(B) Mandatory withdrawal.
 A lawyer representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, and a lawyer representing a client in other matters shall withdraw from employment, if:
 * * *
 (4) He is discharged by his client.
DR 6-101 Failing to Act Competently.
(A) A lawyer shall not:
 * * *

At the conclusion of the hearings the trial judge framed the following as the issues to be determined by him:

1. Did Respondent violate any Disciplinary Rules by making an agreement with Malcomb that his representation of Malcomb would cost $1,000.00 and yet intended, at the time of the agreement, to charge an additional fee based on certain factors, including a successful result?

2. Did he further violate any Disciplinary Rule by allegedly misrepresenting to Malcomb that his case was not yet resolved in the judge's mind until the August 9, 1976 decree was signed and that he was working on the case, when in fact, the judge's ruling was on July 20, 1976 (and the only matter remaining was the drafting and approval of the Order) and Respondent was not working on the case at all but rather trying to give the appearance of work in order to exact an improper fee from Malcomb?

3. Did Respondent violate any Disciplinary Rule by furthering a fraud on the court in not advising the court that the Malcomb decree was based on a fraudulent decree, i.e., a backdated separation agreement?

4. Did Respondent violate DR 1-102(A)(5) by his alleged conduct in paragraph 1, 2 and 3 above?

5. Did Respondent violate DR 1-102(A) (6) by maliciously escalating his fee to Malcomb and attempting to obtain improperly an improper fee from Malcomb in the absence of any fee agreement by Malcomb and in the absence of any basis therefor and by using the courts to obtain such improper fee?

6. Did Respondent violate said latter Disciplinary Rule by his alleged conduct in 2 above?

---

(2) Handle a legal matter without preparation adequate in the circumstances.

(3) Neglect a legal matter entrusted to him.

7. Did Respondent violate DR 2-110(A)(2) by improperly withholding Malcomb's papers and the decree after being discharged by Malcomb?

8. Did Respondent violate DR 6-101(A)(2) by lack of adequate preparation in that he conducted no discovery, interviewed no witnesses before trial, called witnesses who were of little or no probative value, failed to call witnesses who were of probative value and generally displayed no knowledge of the facts surrounding the Malcomb case?

In his consideration of the matter the trial judge lumped together the issues concerning escalation of the fee. He found "by clear and convincing evidence that [Kerpelman] represented to Malcomb that his total fee for his representation in the custody case would be One Thousand Dollars ... and no more but that in violation of his agreement, he charged (or attempted to charge) Malcomb fees over the agreed upon amount; that [Kerpelman] made a wilful misrepresentation to Malcomb as to [Kerpelman's] fee; that [Kerpelman] maliciously and improperly escalated fee charges to Malcomb without any basis, without any agreement, without any warning; and without the escalated charges bearing any relationship to the amount of work done." On the basis of that finding he concluded that Kerpelman violated DR 1-102(A)(4) concerning engaging in conduct involving dishonesty, fraud, deceit, or mis-representation; DR 1-102(A)(5) concerning engaging in conduct prejudicial to the administration of justice; DR 1-102(A)(6) concerning engaging in other conduct adversely reflecting on his fitness to practice law; and DR 1-102(A)(1) stating that a lawyer shall not violate a disciplinary rule.

On Issue 2 relative to misrepresentation as to whether or not a case had been "resolved in the judge's mind" the trial judge "conclude[d] by clear and convincing evidence that [Kerpelman] deliberately misrepresented to Malcomb that there remained work to be done on this ... case and that ... [Kerpelman] was actually engaged in performing such work, whereas, after July 20, 1976, there remained no work to be done and [Kerpelman], in fact, performed no work and that

this misrepresentation was made to justify an improper fee." Upon this finding he concluded that there was a violation of DR 1-102(A)(4) and DR 1-102(A)(6).

The trial judge said he was "not convinced by clear and convincing evidence that [Kerpelman] furthered a fraud on the court" by "doing nothing to either advise Malcomb or the court of Malcomb's knowing acquiescence in [his former wife's] backdating of their separation agreement . . . ." He likewise found no clear and convincing evidence that Kerpelman violated DR 2-110(A)(2) relative to withdrawal from employment by withholding Malcomb's papers and the decree after being discharged by Malcomb and by continuing to deal with the chancellor after such discharge.

The trial judge likewise found no violation of DR 6-101(A)(2) on the issue of adequate preparation, stating, "What Bar Counsel perceives as inadequacy may well be trial tactics."

## II The Draper matter

The petition for disciplinary action alleged that Marlene S. Draper was awarded a divorce a vinculo matrimonii from David W. Draper on or about January 7, 1975, in which she was awarded custody of their child; that in April 1976 Draper sought Kerpelman's representation of him in an effort to have the decree modified by having custody awarded to him; that Kerpelman advised Draper "that the fee would be $960 plus court costs and that the fee should be paid prior to the date of any hearing on modification"; that Draper paid Kerpelman $500 on or about April 15, 1976; that on or about May 7, 1976, Kerpelman "submitted a bill to Draper in the amount of $10 for 'Filing fee for Petition for Modification of Decree as to Child Custody'"; that on or about May 14, 1976, Kerpelman filed a petition on behalf of Draper in the Circuit Court for Anne Arundel County for modification of the custody decree; that "[d]uring the period April, 1976, to August 21, 1976, [Kerpelman] advised and counseled Draper to take his child from Marlene S. Draper, then living in Syracuse, New York, and further planned

with Draper the methods by which he was to obtain the child, notwithstanding the award of custody [in the divorce decree]"; that "[a]cting at the direction of [Kerpelman], on or about August 21, 1976, Draper entered the apartment in which Marlene S. Draper was then living, in Syracuse, New York, and '... Took the child *without the permission or consent of Marlene S. Draper* ... ,' returning with the child to Maryland"; that on or about September 7, 1976, Draper forwarded $460 to Kerpelman, being the remainder of the fee to which reference was previously made; that on or about September 30, 1976, the Circuit Court for Anne Arundel County ordered Draper to return the child to Marlene S. Draper "and to show cause why he should not be found in contempt of that court for his actions [in retrieving the child]"; that on or about March 23, 1977, a hearing was held on Draper's petition for modification of the custody decree, which hearing resulted in an award of custody to Draper; that although Draper "on numerous occasions [requested] an interview in [Kerpelman's] office prior to the hearing of March 23, 1977, [Kerpelman] refused to meet with Draper"; that on or about March 24, 1977, Kerpelman "submitted a bill to Draper for an 'Additional final fee based on fully successful conclusion of case,' in the amount of $850, which amount Draper refused to pay"; that as a result of Draper's refusal to pay this sum of $850 "[Kerpelman] refused, upon Draper's request, to provide Draper with a copy of the Decree of Modification resulting from the hearing of March 23, 1977"; and that Kerpelman withdrew from representation of Draper on or about June 21, 1977, without providing Draper with a copy of the decree of modification. (Emphasis in original.)

Bar Counsel claimed that as a result of his actions Kerpelman had violated DR 1-102(A)(1), (4), (5), and (6); DR 2-106 (A); DR 2-110(A)(2); DR 6-101(A)(2) and (3); DR 7-102(A)(7); and DR 7-106(A).[3] The charges relative to excessive fees and neglect ultimately were dropped.

---

**3.** The text of these disciplinary rules will be found in n. 1 and n. 2.

At the conclusion of the hearings, the trial judge framed the following as the issues to be determined by him:

1. Did Respondent agree that his representation of Draper would cost "about $1,000.00" at a time when Respondent intended to charge more based on certain factors including a successful result?

2. Did Respondent violate any Disciplinary Rules by advising Draper to retrieve (meaning illegally child snatch) the child from Syracuse, New York in flat violation of an unmodified court decree awarding custody of the child to Draper's former wife (mother of the child)?

3. Did Respondent violate DR 1-102(A)(5) by his alleged conduct in 1 above?

4. Did Respondent violate said latter Disciplinary Rule by his alleged conduct in 2 above.

5. Did Respondent violate DR 1-102(A)(6) by his alleged conduct in 1 above?

6. Did Respondent violate said latter Disciplinary Rule by his alleged conduct in 2 above?

7. Did Respondent violate DR 2-110(A)(2) by allegedly refusing to deliver to Draper, the decree of modification (or copy) of March 23, 1977 (awarding custody to Draper — the result sought by Draper and objective in his hiring Respondent) after the modification hearing and after Draper discharged Respondent? Did he further violate said Disciplinary Rule by not avoiding foreseeable prejudice to Draper before he withdrew his representation of Draper and by doing nothing for Draper in the face of danger of additional litigation?

8. Did Respondent not violate DR 6-101(A)(2) by lack of adequate preparation, in that he never conducted discovery, never interviewed any witnesses nor had in person interviews with Draper?

9. Did Respondent not violate DR 7-102(A)(7) and 7-106(A) by his alleged conduct in 2 above?

The most serious charge against Kerpelman is that he advised a client to take steps to recover his child from the child's mother in New York State when, as Kerpelman knew, the mother had custody pursuant to a decree of one of the courts of this State. Here, as will fully appear by reference to the appendix to this opinion setting forth the findings verbatim, the trial judge found as a fact that Kerpelman "did suggest to his client, in flat violation of the Decree, that he (Draper) physically take the child from the Syracuse residence where she was living with her mother; that it was [Kerpelman's], and not Draper's suggestion; [and] that [Kerpelman] told Draper to not make it look like a breaking and entering but just to get the child . . . ." He found under this issue "by clear and convincing evidence that [Kerpelman's] conduct was in violation of Disciplinary Rules 1-102(A)(1), 1-102(A)(4), 1-102(A)(5) and 1-102(A)(6)" relative to conduct involving dishonesty, etc., conduct prejudicial to the administration of justice, engaging in other conduct adversely reflecting on his fitness to practice law, and violation of disciplinary rules.

On the issues concerning misrepresentation as to fee, the trial judge said, "Despite all of the highly suspicious circumstances, I cannot find by *clear and convincing evidence* that [Kerpelman] intended to improperly charge a fee to Draper in violation of their fee 'agreement.'" (Emphasis his.) Likewise, on the issue relative to inadequate preparation the trial judge said he could not "find by *clear and convincing* evidence that [Kerpelman's] representation was *so* inadequate as to conclude that he violated DR 6-101(A)(2)." (Emphasis his.) His concluding comment on this issue was, "In sum, while [Kerpelman's] representation was spotty and somewhat deficient, this court cannot find by *clear and convincing evidence* that [Kerpelman] handled the Draper case without preparation adequate in the circumstances." (Emphasis his.)

### III Bar Counsel's exceptions

Bar Counsel has excepted to the failure of the trial judge to find inadequate preparation in both the Draper and Malcomb matters and his failure to find that Kerpelman misrepresented the matter of his fee in the Draper matter. The trial judge saw and heard the witnesses. We did not. Our consideration of the exception for that reason must be similar to that where an action has been tried by the lower court without a jury. In that circumstance Maryland Rule 886 provides that "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." In fact, in *Bar Ass'n v. Marshall,* 269 Md. 510, 516, 307 A.2d 677 (1973), Judge Digges observed for the Court that in a disciplinary case, referring to findings by a trial judge, "[T]he master's findings of fact from the evidence are prima facie correct and they will not be disturbed unless determined to be clearly erroneous." In *Moran v. Moran,* 219 Md. 399, 149 A.2d 399 (1959), we held that evidence should *not* have persuaded a trier of fact to a given conclusion warranting relief. Here we are requested to hold that evidence *should* have persuaded a trier of fact that certain violations existed. There is a substantial difference between the two propositions.

In *Racine v. Wheeler,* 245 Md. 139, 144, 225 A.2d 444 (1967), Judge McWilliams said for the Court, "Since the jury is free to believe only a portion of the evidence of each side the synthesis apparently accomplished by the jury is simply a manifestation of its obvious function." This comment continues to have viability. We have said this is no less true when a judge is the trier of fact. *Clemson v. Butler Aviation,* 266 Md. 666, 672, 296 A.2d 419 (1972), and *Davidson v. Katz,* 254 Md. 69, 80, 255 A.2d 49 (1969). The burden of proof was on Bar Counsel. On this record we cannot say that the trial judge was clearly in error when, after considering all of the evidence, he was not convinced that Kerpelman misrepresented the fee to Draper or that Kerpelman failed to prepare properly the Draper and Malcomb cases for trial. As we observed in *Eidelman v. Walker & Dunlop,* 265 Md.

538, 545, 290 A.2d 780 (1972), and repeated in *Phelps v. Goldberg,* 270 Md. 694, 707, 313 A.2d 683 (1974), "For many years juries have been instructed at the request of defense counsel to the effect that if the evidence on a given proposition left their minds in a state of even balance or equipoise, then their verdict should be for the defendant because the plaintiff had not met his burden of proof. . . . A judge sitting as a trier of fact is not expected to go further in reaching a conclusion from the evidence before him than a jury." Certainly, where the burden is to produce clear and convincing evidence (a greater burden than in the ordinary civil case), the principle is no less applicable.

## IV Kerpelman's exceptions

### 1 — Right of trial by jury

Kerpelman claims that "[h]e was denied the right to the interposition of a jury at any stage in the proceedings, either as trier of fact or as trier of fact and in law, and claims he is entitled to both." As with virtually all of his exceptions, he does not cite any cases or other authority in support of his claim nor does he specify from whence comes the right.

We assume that the right claimed to have been abridged is the one guaranteed by Maryland Declaration of Rights Art. 5. This is reinforced by a purported election for jury trial filed in the trial court in which Kerpelman said, "That, said case being quasi-criminal in nature, the defendant further demands that all matters both of law and fact be submitted to the jury for its determination, as provided by the Constitution of the State of Maryland." In *Maryland St. Bar Ass'n v. Sugarman,* 273 Md. 306, 318, 329 A.2d 1 (1974), *cert. denied,* 420 U.S. 974 (1975), we held that a disciplinary action against an attorney does not involve a criminal or quasi-criminal sanction within the purview of the Fifth Amendment to the Constitution of the United States.

Maryland Declaration of Rights Art. 5 states in pertinent part, "That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according

to the course of that Law ...." In *Knee v. City Pass. Ry. Co.,* 87 Md. 623, 624, 40 A. 890 (1898), Judge Pearce referred to this provision and said for the Court, "Language of similar import, is found in the Constitution of each of the United States, and the authorities are therefore naturally uniform to the effect, that it is the historical trial by jury, as it existed when the Constitution of the State was first adopted, to which the inhabitants of each State are entitled ...." Maryland Rule BV10 d concerning hearing of disciplinary charges states, "The hearing of charges is governed by the same rules of law, evidence and procedure as are applicable to the trial of civil proceedings in equity." Civil proceedings in equity are not heard by juries nor were they at the time of the adoption of the Constitution of 1776. At one time we did have a statutory procedure in Maryland for sending issues from a court of equity to a court of law for determination by a jury. This no longer prevails. The Maryland authority, E. Miller, *Equity Procedure in Maryland* § 232 (1897), states, "An issue of fact to be tried by a jury is not a matter of right, at any stage of the proceedings, independently of statute ...." *Id.* 290-91. Thus, it follows that lawyer disciplinary proceedings are not required by the Constitution of Maryland to be heard by juries.

Even were there no provision in our rules to the effect that the proceedings should be conducted as in equity, disciplinary proceedings against attorneys, in the absence of a rule or statute providing to the contrary, are not encompassed within the constitutional guarantees of trial by a jury, be that guarantee state or federal. *Ex parte Wall,* 107 U.S. 265, 288-89, 27 L. Ed. 552, 2 S. Ct. 569 (1883); *Ex parte Burr,* 4 F. Cas. 791,796, 1 Wheeler, *Crim. Cas.* 503, 519-20, 2 Cranch C.C. 379, 390-91 (D.C. Cir. 1823), aff'd 22 U.S. (9 Wheat.) 529, 6 L. Ed. 152 (1824); *Ex parte Thompson,* 228 Ala. 113, 152 So. 229 (1933), and 7 Am. Jur. 2d *Attorneys at Law* § 90 (1980). *Thompson* contains an excellent analysis of the matter and reviews decisions in numerous jurisdictions upon the subject. This contention is without merit.

## 2 — Motions raising preliminary objection

Kerpelman says, "Each and every Motion Raising Preliminary Objection made by [him] below should have been granted." He adds no more. This is not an acceptable method of procedure. *See, e.g., Dean v. Redmiles,* 280 Md. 137, 169-70, 374 A.2d 329 (1977), and *State Roads Comm. v. Halle,* 228 Md. 24, 178 A.2d 319 (1962). In the latter case Judge Prescott said for the Court:

> Under its "Statement of Facts" in its brief, appellant alleges that, "both real estate witnesses [of the appellees] Jones and McCurdy, over objection, subtracted from their after value the sewer deficits computed by the witness Matz," without reference to the record extract wherein the witnesses testified as alleged, or the objections were made. Still under the same heading, it then alleges, "appellant moved that * * * that part of the real estate witnesses' testimony concerning sewer deficits be stricken, which motion was denied (E. 259-260)." The record sustains the fact that this motion was made and denied.
>
> But neither under this heading nor the heading of "Argument" in its brief does it present any argument in support of its contention on this point, nor do the appellees deal specifically with the question. Under these circumstances, we conclude the point has been waived. Maryland Rule 831 c 4; cf. *Fid. & Dep. Co. v. Mattingly Lumber Co.,* 176 Md. 217, 220, 4 A.2d 447; *Comptroller v. Aerial Products,* 210 Md. 627, 644, 124 A.2d 805. Surely it is not incumbent upon this Court, merely because a point is mentioned as being objectionable at some point in a party's brief, to scan the entire record and ascertain if there be any ground, or grounds, to sustain the objectionable feature suggested. [*Id.* 31-32.]

We have examined the motions raising preliminary objection, however, and find no error in their denial.

### 3 — Rulings on evidence

Kerpelman "excepts to the myriad rulings made by [Judge] Levin below on [Kerpelman's] objections to the introduction of evidence, and to each such ruling, and he makes each such ruling ground for exceptions to the acceptance of the findings which were made." That which we have just quoted from *Halle* is applicable here. Surely, it is not incumbent upon us to comb a transcript covering hearings approximately four weeks in length to find "the myriad rulings ... on ... objections to the introduction of evidence" when the experienced attorney involved does not see fit to specify to which rulings on the evidence he takes exception nor to state the basis of his objections. In our examination of the transcript, however, we have discovered no errors.

### 4 — Rulings on motions

Kerpelman "excepts to the various rulings on motions which were made against him in the hearing below and he makes each such erroneous ruling the ground of an exception to the acceptance of the findings made." Again, he has failed to be more specific. We have found no errors in our examination of the record.

### 5 — Motions for mistrial

Numerous motions for mistrial were made during the course of the hearings. On this issue Kerpelman says he excepts "particularly [to] the failure to grant each and every specific motion or request for mistrial which was made below; he makes each of the said failures, which number approximately thirty or more the basis of an exception and says that each of the motions or requests for mistrial was well made or well taken and that for the failure to grant any, the findings made below should be dismissed."

It must be remembered that a trial judge in the position of Judge Levin in this case sits as our hearing examiner. *Attorney Griev. Comm. v. Bailey,* 285 Md. 631, 637, 403

A.2d 1261 (1979), and *Bar Ass'n v. Marshall, supra,* 269 Md. at 515-16. We note that Kerpelman has failed to be specific even as to the number of motions for mistrial he made. Assuming, arguendo, that such a motion is proper in this type of proceeding, from our examination of the record we find no error on the part of Judge Levin. Rather, we believe Judge Levin is entitled to commendation for his patient, courteous handling of a difficult proceeding.

6 — 9, inclusive — Further rulings on evidence

Kerpelman has excepted to the trial judge's "failure to permit testimony as to [Kerpelman's] ordinary practice as concerns fees," his "failure to permit witnesses called by [Kerpelman] to testify thereto referring to [the practice concerning fees]," his "failure to permit other witnesses called by [Kerpelman] to testify," and "[t]he limitation on the number of character witnesses called by [Kerpelman]." Again, we find a lack of specificity. Although we permitted Kerpelman to file a revised brief subsequent to the argument in this matter, that rambling, forty-page document does not address this or many other points raised by the exceptions.

We have observed many times that the reception of evidence is to a large degree entrusted to the discretion of the trial court and its action will seldom constitute grounds for reversal. *See, generally, e.g., State v. Conn,* 286 Md. 406, 425, 408 A.2d 700 (1979); *Impala Platinum v. Impala Sales,* 283 Md. 296, 332, 389 A.2d 887 (1978); *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977); *Andrews v. Andrews,* 242 Md. 143, 152, 218 A.2d 194 (1966); *Smith v. State Roads Comm.,* 240 Md. 525, 214 A.2d 792 (1965); *Sanner v. Guard,* 236 Md. 271, 277, 203 A.2d 885 (1964); *Turner v. State Roads Comm.,* 213 Md. 428, 434, 132 A.2d 455 (1957); *Reid v. Humphreys,* 210 Md. 178, 185, 122 A.2d 756 (1956); *Barranco v. Kostens,* 189 Md. 94, 97, 54 A.2d 326 (1947); *Zeller v. Mayson,* 168 Md. 663, 667, 668, 669, 179 A. 179 (1935); *Ice Machinery Corp. v. Sachs,* 167 Md. 113, 126, 173 A. 240 (1934); and *Maryland Electric Ry. v. Beasley,* 117 Md. 270, 277, 83 A. 157 (1912). We find no error in this case.

10 — 16, inclusive — Alleged bias, prejudice,
etc., of Judge Levin

These contentions are without merit.

17 and 18 — Weight of the evidence

In his seventeenth exception Kerpelman attacks the weight given to certain of the evidence, saying it "could not possibly have been 'clear and convincing' . . . ." We perceive no error.

In his eighteenth exception he suggests, "As a matter of law an attorney cannot be found to have erred by 'clear and convincing evidence' when the only evidence in the case is the testimonial evidence, as here, of the complaining witnesses in the two separate cases."

We recently had occasion in *Berkey v. Delia,* 287 Md. 302, 413 A.2d 170 (1980), to discuss clear and convincing evidence under the rule enunciated relative to libel and slander actions in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). We said:

> The fact that this is a "one on one" situation in no way precludes a determination by clear and convincing evidence as to which is speaking truthfully. That this is so is readily understood when we point out that in a criminal case an individual may be convicted upon the testimony of one witness who says that he saw the accused do the act constituting the crime notwithstanding the fact that the accused may say that he was not even present at the scene of the crime. Proof beyond a reasonable doubt, required in criminal cases, is a higher standard than proof by clear and convincing evidence required in a defamation case such as this. [*Id.* at 330.]

We point out that in *Caviness v. State,* 244 Md. 575, 224 A.2d 417 (1966), Judge Marbury said for the Court:

> We have held that the testimony of one eye witness, if believed, is sufficient to convict, *Turner v. State,*

242 Md. 408, 219 A.2d 39; *Hammond v. State*, 241 Md. 733, 217 A.2d 569; and *Wesbecker v. State*, 240 Md. 41, 212 A.2d 737. The trial court in a nonjury case is entitled to believe the identifying witness rather than alibi witnesses who place appellant elsewhere. *Campbell v. State*, 231 Md. 21, 188 A.2d 282; Rule 886 a. [*Id.* at 579.]

This contention of Kerpelman is without merit.

### 19 and 20 — Failure of the judge "to consider or discuss" certain evidence

The opinion of the trial judge here covered eighty-five pages with more than eighteen additional pages of footnotes appended. The fact that certain evidence is not discussed in an opinion, even one as long as the one here before us, certainly does not indicate that there was a failure to consider any given evidence. It surely is not incumbent upon a judge in any case to discuss every piece of evidence presented. We perceive no error.

### 21 — Admission of testimony of Mr. Brecka

Kerpelman claims error in "[t]he admission of evidence of a collateral issue, that is the Brecka episode, and the admission of any of [Brecka's] testimony . . . ."

Kerpelman testified as part of his case:

A. When you have performed a child snatch, as any number of my clients on my advice have done, this also coming into play in showing that these statements are not, I believe, really inconsistent.

First of all, the use of the word "child snatch" was perhaps an unfortunate choice of words. I have for a long time regularly had occasion to advise fathers in the throes of a marital dispute, that in the absence of a court order, they can have an equal right to possession of the child and to obtain possession of the child. And this is a very vexed subject which is directly discussed in the meetings

and legal clinics of Fathers United for Equal Rights.

And in the course of these many discussions at these legal clinics, the term "child snatch" has apparently come to be used to describe getting your child under circumstances which certainly can be valid circumstances. I *never* advised, never to the best of my recollection, advised a client to do that if there is a court order. [Emphasis added.]

This exception is based upon the fact that Bar Counsel later produced William Brecka as a witness. He testified relative to conversations with Kerpelman prior to the incident with which we are here involved:

A. The second conversation I had with him on the telephone when he asked — when he told me that I have to have a check for $950.00 or $850.00 and I have to be willing to do anything that was necessary to get custody of the children and I asked him what he meant by that and he kept avoiding the answer "well, just whatever is necessary," and he went on in that vein for a couple of more times and I decided well, I guess I am not going to get an answer here. It was at then the next time I met him was at a Father's United Meeting. After the meeting, outside the meeting room I got him alone at the top of the stairway and I said, "Now, what exactly do you mean by anything necessary to get the children" and he said, "Look," he said, "I will deny it if I am asked, but you have to get the children and keep the children and go as far away as possible and stay away as long as possible." That was the end of that conversation.

In his opinion, which we have reproduced in the appendix, Judge Levin dealt at some length with the admissibility of this testimony. He concluded by stating:

The Brecka testimony was admitted solely for the

purpose of credibility and has not been considered substantively. Finally, the evidence against Respondent is so overwhelming otherwise, that even if the Brecka testimony were inadmissible, it would make no difference at all.

We have heretofore pointed out the wide discretion with which a trial judge is vested in the matter of admission of evidence. Even if there were error here, which we certainly do not hold, the concluding statement by Judge Levin makes plain that such error would not be a basis for our rejecting his findings.

### 22 and 28 — Malcomb as a credible witness

In his twenty-second exception Kerpelman took issue with "[Judge] Levin's 'finding' that Malcomb was both a 'credible' and 'truthful' witness, when Malcomb admitted on the stand under oath that he lies 'when it is to his advantage'."

In his twenty-eighth exception Kerpelman said:

It is explicitly stated in the Record that Malcomb, by admission, "Lies when it is to his advantage"; the testimony of such a witness cannot, as a matter of law, amount to "clear and convincing evidence" in disciplinary charges against an attorney.

It was for Judge Levin to weigh all of the evidence. He saw and heard this witness. We have no reason to believe that he failed to weigh this statement of Malcomb in his determination of credibility. We perceive no error.

### 23 and 24 — The Malcomb fee

Kerpelman states:

23. No charge was originally made as to any "excessive fee", but this sort of charge, apparently out of deference to More Important members of the bar than the Respondent was carefully avoided, but in fact, that is all that the charge concerning

Malcomb amounts to by any clear and convincing evidence.

24. The Inquiry Panel made a formal finding that "no excessive fees were charged" and therefore each and every finding in any way related to fees should be rejected, (a) as a general matter of Due Process, (b) as a general matter of evidence and weight of evidence, (c) as a matter which was not properly charged against the Respondent, (d) as a new charge which the Respondent was not informed of and would not have known of before the hearing.

Throughout this proceeding Kerpelman has attempted unsuccessfully to portray himself as a victim of some sort of conspiracy on the part of "rich" lawyers in large firms.

As Judge Levin pointed out, on June 15, 1979, prior to the trial of this case on its merits, Bar Counsel withdrew the charges of violations of DR 2-106(A) (clearly excessive fee) in the relations of Kerpelman to Malcomb and Draper. We find this exception to be without merit.

25 and 26 — Allegations that Judge Levin "consciously, maliciously, and deviously misled this Court" and "distort[ed] the Record"

These exceptions are so frivolous as to be unworthy of comment.

27, 29, and 30 — Draper as under the influence of cocaine

Kerpelman says in these exceptions:

27. As to Draper, the Record contains a clear inference that he was under the influence of cocaine when he testified before Levin; as a matter of law an attorney cannot be found guilty for a disciplinary violation upon the testimony of one under the influence of cocaine.

29. The witness Draper testified in the case, and then after suspicions were aroused on the part of the Respondent, an Interrogatory was submitted to

him asking whether he was on cocaine at the time he testified. Draper took the Fifth Amendment. Levin refused to strike the testimony. Levin accepted the word of Draper as to what had happened over the word of Kerpelman. This exception is that as a matter of law an attorney may not be found guilty under a "clear and convincing proof" test where the only evidence against the attorney is the uncorroborated testimony of a person who took the Fifth Amendment as to whether he was under the influence of cocaine when he testified.

30. The averments of exception 29 are hereby adopted by reference; Levin's refusal to strike Draper's testimony was severe and substantial error.

He fails to point out the portion of the record from which one might perceive this clear inference. As Bar Counsel puts it, Kerpelman "builds his case for the lack of competence of Draper upon his own suggestions and innuendoes, which are devoid of proof." We agree. Draper testified on June 18, 1979. If in fact Kerpelman at that time had information that Draper was under the influence of cocaine while testifying, that information should have been brought to the attention of the trial judge then. This allegation was presented to the trial judge at the last hearing in this matter in September 1979. Thus, it was clearly before the trial judge when he evaluated the evidence adduced. He is not clearly in error in his evaluation.

31 — Admission of evidence as to Kerpelman's "further[ing] fraud on the Court"

This exception in its entirety reads:

Levin erroneously admitted evidence concerning Respondent's "further(ing) fraud on the Court" (See page 67 of Levin's opinion) although the Respondent was not charged with this. This was the material relating to Malcomb having committed perjury in obtaining his original divorce by stating

that the separation took place before the date when it actually did.

This was another side issue brought in by Levin, it obviously colored his decision although he did not make a finding of guilty on this matter, but the admission of this evidence must have been prejudicial. See *Bar Association v. Cockrell,* 270 Md. 686, 313 A.2d 816 (1974) holding that the charges must be "sufficiently clear and specific" so as to make the attorney aware of what he is compelled to answer for and defend against. At no time prior to the admission of this evidence by Levin had Kerpelman been charged with anything having to do with this backdating, which occurred long before Kerpelman was representing Malcomb. It was sprung on Kerpelman for the first time in the midst of the trial.

This is a false issue, to put it mildly. We have already quoted from Judge Levin's opinion (without specifying, however, that he said it on page 67) to the effect that on the issue of backdating of the separation agreement he was "not convinced by clear and convincing evidence that [Kerpelman] furthered a fraud on the court." He also said in that opinion:

Respondent tried to exploit the fact that Malcomb accommodated [his former wife] when she "backdated" their separation agreement one month. This was mendacious conduct on Malcomb's part and Respondent excoriated Malcomb. However, by the same token, Respondent too knew that the March 29, 1974 agreement was based upon a fraudulent date and he too did the same thing as Malcomb — he kept quiet. His testimony concerning this inaction is evasive and unconvincing. Apart from this, I find Malcomb's testimony truthful and credible.

Kerpelman began his cross-examination of Malcomb on June 19. When court reconvened on June 21 other witnesses

were put on the stand as an accommodation to various persons. Then Malcomb resumed the stand for further cross-examination. The first question propounded by Mr. Kerpelman to Malcomb was whether he had "ever lied to get a desired result in an important matter." After a response that he was unaware of having done so, Kerpelman showed him a letter from Malcomb to Kerpelman dated May 5, 1976. Then the record reflects:

> MR. KERPELMAN: Now, if Your Honor please, I feel that, perhaps, it is incumbent on me to suggest to the witness that he has a right, I believe, not to answer under the Fifth Amendment to the United States Constitution. Shall I advise him on that?

A lengthy discussion then ensued. Ultimately a copy of the letter in question was made and delivered, with her husband's consent, to Mrs. Malcomb in order that she might consult an attorney on his behalf. When court resumed that afternoon it was brought out that after consultation with his attorney Malcomb had no objection to testifying. The letter in question was shown to Malcomb. After Malcomb's identification, it was admitted into evidence upon Kerpelman's motion as "Respondent's Exhibit No. 5." The first paragraph of the letter states:

> At the time my former wife and I signed our separation agreement, she requested that I agree that the separation actually had taken place the previous February rather than in March. She seemed very anxious that I do this, so I agreed. This obtained the divorce one month sooner than would otherwise have been possible.

Having himself introduced the letter into evidence, Kerpelman cannot now be heard to complain relative to its admission. Moreover, as Kerpelman concedes, the trial judge did not find clear and convincing evidence to indicate that Kerpelman had furthered a fraud on the court.

32 — Judge Levin's alleged "clear and absolute error of law" relative to Kerpelman's fee dispute with Malcomb

In this exception Kerpelman states:

> 32. Levin committed a clear and absolute error of law in coming to his conclusion that Malcomb had been overcharged. At page 63 of Levin's opinion he referred to the Respondent's continuing to contend, to argue, in Malcomb's behalf, upon the question of whether Malcomb should pay support when one child was awarded to him and one child was awarded to the mother. Levin states the question was *not* still open. [(Emphasis in original.)]

At page 64 of his opinion Levin, with emphasis, states:

> "Despite Merle's (the mother's) earning *capacity* (she was *not* then employed) and marriage, it was decidedly unrealistic to expect any court to not require a father (earning near $22,000 per year — as per Malcomb's Answer 3 to Merle's Interrogatory — as prepared by Respondent) to pay something for the support of his child."

This is a complete and total misstatement of the law as it existed at the time in question, which was 1976. At that time the law was enunciated in the case of *Hare v. Hare,* a *per curiam* decision filed February 22, 1974, No. 443, September Term, 1973. This is an unreported decision and it is not referred to here as a citation. Rather it is referred to to show what the Court of Special Appeals itself has said the law was at that time, and because reference to it was part of the trial testimony. The *unrefuted,* uncontradicted, evidence in the case before Levin *was* that this was the law at that time. The Respondent specifically so testified. But no, Levin takes matters into his own hands and states the law

*another* way, and erroneously. At page 7 of the *Hare* opinion it is stated:

"The amount of support each will be required to provide is to be determined by an evaluation of each party's relative financial status, work history and *earning capacity.*" (Emph. supp.)

Thus Levin's finding was clearly erroneous as a matter of law.

A copy of *Hare v. Hare* is attached hereto.

The *Hare v. Hare* test of *earning capacity* was not changed until *Rand v. Rand,* [280 Md. 508,] 374 A.2d 900 [(1977)], wherein, in 1979 [sic], the court seems to have changed the test to something else. But the rule set forth in *Hare* is the rule as it existed at the time in question.

Kerpelman testified in the case below that this was the law and there was no contradiction. Nor can any citation be produced against this proposition. Kerpelman testified that he had this above quoted passage memorized and it was the test in all of his cases at that time.

It is also pointed out that the testimony was that the mother was married to a spouse who was earning around $30,000 per year, and therefore had negligible or no overhead expenses of her own, so that whatever money or earning capacity she had, was entirely available for the support of the child in question. [Emphasis in original.]

What Judge Levin said on page 63 of his opinion was:

It is undisputed that Respondent never discussed any of his escalating bills with Malcomb beginning with the Six Hundred Fifty Dollar ($650.00) bill. He simply sent them to Malcomb. As to Respondent's August 26, 1976 bill of One Thousand Two Hundred Fifty Dollars . . . ("Additional final fee based on successful result,") if the July 20, 1976 conference (at 2:00 P.M.) with Judge MacDaniel left matters so

up in the air as Respondent contended ("subject to all sorts of wavering winds of change . . . open at that time, was the question of whether Malcomb should pay support, it was still open to contest"), why would Respondent charge Malcomb an additional fee for "successful result?" According to Respondent, he felt that the July 20, 1976 decision reached by Judge MacDaniel (requiring Malcomb to pay Twenty-five Dollars . . . per week as support for Heather) was "unreasonable and unfair" and felt it would be "preferable to have a formal hearing." Obviously, in Respondent's mind, this could not be called a "successful result" under such unfair circumstances even if Malcomb did retain Kirsten (whom he had before Respondent came to represent him).

The quotation by Judge Levin on page 63 concerning "subject to all sorts of wavering winds of change," etc., was from Kerpelman's response to Bar Counsel's demand for admission of relevant facts. The demand was that Kerpelman admit that "in [a] telephone call [previously referred to in the demands he] advised John D. Malcomb that the 'custody matter,' referring to the decision in the case of *Malcomb v. Malcomb,* Equity No. 78654, was not yet settled." Kerpelman denied the statement, saying he "ha[d] no recollection as to this but by virtue of the fact situation, [it was] quite unlikely that this would have been stated," adding that "the question [was] designed as a conscious trap for the tryer [sic] of fact in this case." He then went on to claim "that custody matters and in fact all equity matters are in fact still open until decree is signed." He then made the other statements quoted by Judge Levin.

We agree with Judge Levin that under the law as it has existed and continues to exist it is unrealistic to expect a court not to require a father earning $22,000 per year to pay *something* for the support of his child.

Kerpelman is in error when he suggests that the trial judge came to a "conclusion that Malcomb had been overcharged." He reached no such conclusion. He

determined, as we have earlier indicated, that Kerpelman represented to Malcomb that his total fee for representation would be $1,000.00 and no more, but that in violation of this agreement Kerpelman charged or attempted to charge Malcomb fees over and above the agreed upon amount, that Kerpelman made a wilful misrepresentation to Malcomb as to the fee, and that Kerpelman maliciously and improperly escalated the fee charges to Malcomb without any basis, without any agreement, without any warning and without the escalated charges bearing any relationship to the amount of work done.

33 — Changes in transcript

In this exception Kerpelman states:

> 33. Levin has freely, and over objection of the Respondent, made numerous changes in the transcript. These objections appear in the file in the form of letters [sic] from the Respondent. Levin was not authorized by law, and it is unlawful for him to make such changes. He was requested by the Respondent to, at best, make changes by striking through but leaving, the old material so that it could still be seen as part of the record. This too, he refused to do.

Again, Kerpelman neither gives the specifics of his allegations nor cites authority for his position.

The trial judge patiently went over the transcripts. He wrote to the court reporters involved indicating that he wished to bring to their "attention certain errors [he] perceive[d]." He said these corrections were "very minor but [he] fe[lt] that the official transcript should reflect accurately what was actually said." In each instance he said:

> If you do not tell me you disagree with the within by January 9, 1980 (either in writing or verbally), then I will assume that as far as you are concerned, I may correct the official transcripts accordingly. I am sending a copy of this letter to Bar Counsel and Respondent and if they do not object (in writing) on

> or before January 16, 1980, then I shall actually
> correct the official transcripts accordingly. If either
> does so object, in writing before January 16, 1980,
> I shall set in this matter for hearing promptly.

One stenographer stood by his record as to one entry. As to another where the trial judge thought the word "other" should be "none" the stenographer believed it should be "more." Neither Bar Counsel nor Kerpelman filed objections within the time specified.

There are two letters in the file from Kerpelman *after* the deadline set in Judge Levin's letters. One such letter, which hardly can be called an objection, is dated February 1, 1980. It states:

> Citizen Marshall A. Levin
> Criminal Courts Building
> Courthouse
> Baltimore, Maryland 21202
> RE: Attorney Grievance Commission v. Kerpelman
> Misc. Docket (Subtitle BV) No. 1, Sept. Term
> 1979
>
> Citizen Levin:
>
> I have your various letters concerning "errata" in the transcript.
>
> I am reminded of the sage who said:
>
> "Thou seest the mote in the eye of thy brother
> but seest not the beam in thy own eye."
>
> Why don't you disqualify yourself in this matter as your oath of office requires you to do.
>
> /s/ Kerpelman
> Kerpelman
> K/bg
> cc: J. Martin McDonough, Attorney

The other letter is dated January 29. It "demand[s]" that no changes be made. It "also demand[s]" that if there are changes that the transcript be made to show "*what the*

*reading was before [the judge] changed it and what the reading was after [he] changed it.*"(Emphasis Kerpelman's.) The record makes abundantly plain the bases for change.

The following are a few examples selected at random from the various changes proposed by Judge Levin:

| DATE | PAGE | LINE | AS IN TRANSCRIPT | SHOULD BE |
|------|------|------|------------------|-----------|
| 5/28/79 | 42 | 19 | Mosher | Moser |
| 5/29/79 | 271 | 13 | Slicker | Slicher |
| 6/19/79 | 83 | 24 | to | too |
| 6/19/79 | 147 | 4 | aggitated | agitated |
| 7/16/79 | 80 | 12 | or | are |
| 9/7/79 | 6 | 7 | epitaphs | epithets |
| 9/10/79 | 103 | 8 | affect | effect |
| 9/10/79 | 106 | 10 | insistance | insistence |

This contention is without merit.

34 — "[A]buse of, and a denial of Due Process"

In this exception Kerpelman contends:

34. It is an abuse of, and a denial of Due Process to have the fact inquiry made by reference, in effect, to a master, and the question of disposition performed by this court; it is only in the course of a full-fledged fact finding inquiry that the true context, coloration, background, and proper inferences relating to disposition can be acquired; the procedure being used here is therefore invalid.

This is yet another of his contentions for which Kerpelman cites no authority.

For generations in proper circumstances courts, state and federal, including the Supreme Court of the United States, have made use of masters who have heard the evidence after which the ultimate disposition has been made by the court. This contention is without merit.

## 35 — Denial of due process by the extent of the proceedings

In this exception Kerpelman contends:

35. The proceedings were so protracted, expanded, and enlarged, particularly by bringing in collateral and other inadmissable [sic] issues, that the court is now presented with a transcript which it is believed is so long that members of this Court will not read it and the case will be decided not only on the evidence presented, but on the so-called findings of Levin; and these are distortions; and the Respondent is denied thereby Due Process of law.

As these exceptions illustrate, if these proceedings have been unduly "protracted, expanded, and enlarged," to a large degree this is the work of Mr. Kerpelman. Although he has raised myriad issues in his exceptions, many of which are frivolous, to put it mildly, he has made no reference to one very important issue which we shall discuss later in this opinion.

The contention is without merit.

## 36 — This Court's rule making power

In this exception Kerpelman states:

36. This Court's rule making power in this area was a wrongful usurpation of legislative power, and was unlawful; or it was an unlawful delegation by the legislature to this court; in either case it is a denial of Due Process as well as an unlawful exercise of power to determine who shall practice law. Note that the legislature has designated the oath of office for attorneys and it is for the legislature alone to set standards. This court, in addition, bears its own bias and prejudices as to how law should be practiced and has induced these biases and prejudices into, and read them into the proceedings herein, which it has no lawful right to do, and the proceedings are invalid.

Again, no authority is cited for the contention. The superintending power of courts over their bars is deeply ingrained in the system of law which we inherited from our forebears at the time of the American Revolution. It has continued to this day. The contention is without merit.

37—40, inclusive — Findings were arbitrary and capricious, against the evidence, against the weight of the evidence, and not based on clear and convincing evidence

We hold to the contrary. We find clear and convincing evidence to support the conclusion of Judge Levin that Kerpelman escalated his fee in the Malcomb matter, that Kerpelman misrepresented to Malcomb that there remained work to be done on Malcomb's case, and that Kerpelman suggested to his client that in violation of a decree of the Circuit Court for Anne Arundel County (of which Kerpelman had knowledge) that the client physically remove his child from the custodian under the decree, the child's mother. Accordingly, we find clear and convincing evidence of violation of DR 1-102(A)(1) (relative to violating a disciplinary rule), DR 1-102(A)(4) (relative to engaging in conduct involving dishonesty, etc.), DR 1-102(A)(5) (relative to engaging in conduct prejudicial to the administration of justice) and DR 1-102(A)(6) (relative to other conduct adversely reflecting upon an individual's fitness to practice law).

We shall leave to our discussion under Part V of this opinion the question of whether Kerpelman's conduct in the matter of the child amounted to a violation of DR 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1-102(A)(5) (engaging in conduct that is prejudicial to the administration of justice); DR 1-102(A)(6) (engaging in any other conduct that adversely reflects on his fitness to practice law); DR 7-102(A)(7) (to the effect that a lawyer shall not counsel conduct the lawyer knows to be illegal), and DR 7-106(A) (concerning advising a client to disregard a ruling of a tribunal made in the course of a proceeding).

### 41 — Charges added after trial began

In this contention Kerpelman says:

> 41. Charges were added and adduced over and against the Respondent after the trial was begun contrary to the requirements of *Bar Association v. Cockrell,* 270 Md. 686, 313 A.2d 816 (1974).

As our previous discussion of the allegations against Kerpelman and the findings by the trial judge will reflect, Judge Levin's finding of clear and convincing evidence of violations of the disciplinary rules applied to no charge added after the petition for disciplinary action was initially filed in this Court. Hence, this is yet another frivolous contention.

### 42 — Kerpelman's memorandum

This exception is based upon what Kerpelman calls "[Judge] Levin's failure to regard [sic] Respondent's Memorandum filed below." He does not elucidate. Thus, we do not know to what memorandum he refers. He filed a number of memoranda. We can only say that from a detailed, careful examination of the record and transcript we find that Judge Levin gave commendably patient, careful, courteous and detailed consideration to each and every contention advanced by Kerpelman, no matter how frivolous the contention might have been or how irritating or discourteous Kerpelman's manner in advancing his contention might have been.

### 43 — Ex post facto

In this exception Kerpelman says:

> 43. The present proceedings are being carried on under what amounts to an *ex post facto* law; the Respondent should have been proceeded against under the old Canons of Professional Ethics.

Yet again, the basis of the contention and the authority therefor is not specified.

Rule BV1 j defines "misconduct" as "an act or omission by an attorney, individually or in concert with any other person or persons which violates the Disciplinary Rules of the Code of Professional Responsibility as adopted by Rule 1230 . . . ." That Code, appearing as Appendix F of the Maryland Rules, was adopted October 13, 1970. There have been but two amendments since then, one on December 9, 1976, effective January 1, 1977, as result of the Report and Recommendations of the Special Commission to Study Prepaid Legal Service Plans in Maryland, and another on March 8, 1978, effective May 1, 1978, pertaining to lawyer advertising. Those amendments are not involved in this case. The instances in question here all took place subsequent to 1970. Accordingly, this contention likewise is without merit.

## 44 — Tax

In this exception Kerpelman states:

44. The present proceedings were brought and supported under a provision of the Rules of this court laying a tax on members of the legal profession as a requirement of practicing law; only the Legislature can lay or levy a tax; the proceedings therefore are invalid.

He obviously is referring to the fact that Rule BV2 creating the Attorney Grievance Commission provides for the establishment of the Disciplinary Fund. Members of the Maryland Bar are required to contribute annually to it "as a condition precedent to the practice of law" at the same time they pay the sums required under Rule 1228 establishing the Clients' Security Trust Fund. The operations of the Attorney Grievance Commission and the office of Bar Counsel are financed from this fund.

*In re Member of Bar,* 257 A.2d 382 (Del. 1969), *appeal dismissed sub nom. In re Reed,* 396 U.S. 274 (1970), concerned a similar attack upon Delaware's clients' security trust fund. In rejecting such a contention Chief Justice Wolcott said for the Supreme Court of Delaware, "The short

answer to this contention is that the payment required is an assessment and not a tax." *Id.* at 385. This may or may not be correct, but even if Kerpelman's point were well taken, it would not be an excuse for unethical conduct on the part of a member of the bar of this Court, nor would it be a defense to charges relative to such conduct.

### V Legal effect of counseling violation of a court decree

It will be recalled that DR 7-102(A)(7) states that in his representation of a client a lawyer shall not counsel or assist his client in conduct which the lawyer knows to be illegal. This is the principal disciplinary rule which Kerpelman was found by the trial judge to have violated when he gave advice relative to the child. Canon 7, to which this disciplinary rule is applicable, states that a lawyer should represent a client zealously within the bounds of the law.

Kerpelman at oral argument before us opened with a reference to the oath of an attorney when admitted to practice in this Court, focusing on that portion of Code (1957) Art. 10, § 10 in which an attorney says:

> I do solemnly swear (or affirm) that . . . I will bear true allegience to the United States, and that I will support, protect and defend the Constitution, laws and government thereof as the supreme law of the land; any law or ordinance of this or any State to the contrary notwithstanding.

He then said:

> An attorney is to make a judgment as to what rules, ordinances and statutes are unconstitutional and by his Maryland oath of office set forth by the Maryland Legislature, he is to place his opinion of the Constitution above the rules of this Court or an ordinance or statute.

He argued that pursuant to his oath it would be permissible for an attorney to advise a client to violate a court order he deemed constitutionally invalid.

The conventional wisdom of the courts and the legal profession has been that a lawyer may not advise his client to violate a law or court order, except in the instance of a test case where there is a good faith belief that the statute or order may be invalid. *See, e.g.,* EC 7-1; EC 7-2; EC 7-3; EC 7-5; EC 7-22; former Canon 16; former Canon 32; A.B.A. Project on Standards for Criminal Justice, Standards Relating to the Defense Function § 3.7 (approved draft 1971); Cowen, *The Lawyer's Role in Civil Disobedience,* 47 N.C.L. Rev. 587, 592-93 (1969); H. Drinker, *Legal Ethics,* 150, 152 (1953); *Maness v. Meyers,* 419 U.S. 449, 458-60, 468, 95 S. Ct. 584, 42 L. Ed. 2d 574 (1975); *Chapman v. Pacific Tel. & Tel. Co.,* 613 F.2d 193, 197 (9th Cir. 1979); *In re Grand Jury Proceeding,* 601 F.2d 162, 169 (5th Cir. 1979); *United States v. Dickinson,* 465 F.2d 496, 512 (5th Cir. 1972); *Odell v. Bausch & Lomb Optical Co.,* 91 F.2d 359 (7th Cir. 1937); *Snyder v. State Bar,* 18 Cal. 3d 286, 133 Cal. Rptr. 864, 555 P.2d 1104 (1976); *In re Mekler,* 406 A.2d 20 (Del. 1979); *Committee on Professional Ethics, Etc. v. Crary,* 245 N.W.2d 298, 307 (Iowa 1976); *In re Marietta,* 223 Kan. 11, 569 P.2d 921 (1977); *In re Daly,* 291 Minn. 488, 489, 495, 189 N.W.2d 176 (1971); *In Matter of Johnson,* 597 P.2d 740 (Mont. 1979); *In re Cooley,* 95 N.J. Eq. 485, 490, 125 A. 486 (1924), *aff'd* 103 N.J. Eq. 377, 143 A. 916 (1928); *In re Hittson,* 20 N.M. 319, 325, 326, 150 P. 733 (1915); *Territory v. Clancy,* 7 N.M. 580, 37 P. 1108 (1894); *In re Apfel,* 202 App. Div. 76, 195 N.Y.S. 325, 328 (1922); *In re Clostermann,* 276 Or. 261, 263, 554 P.2d 467 (1976); and *Ex parte Miller,* 37 Or. 304, 60 P. 999 (1900).

In this instance Kerpelman has not articulated an argument that the decree was constitutionally infirm. In fact, there is not the slightest suggestion of any infirmity in the Draper custody decree. This was no test case nor did the custody order compel the surrender of any constitutional right.

As to Kerpelman's argument that he did not commit the act alleged, we point out that Judge Levin said:

I find as a fact that in August, 1976, Respondent

did suggest to his client, in flat violation of the Decree, that he (Draper) physically take the child from the Syracuse residence where she was living with her mother; that it was Respondent's and not Draper's suggestion; that Respondent told Draper to not make it look like a breaking and entering but just to get the child; that if it was successful, "we" might get a faster response from the court and it would show good concern on Draper's part; and that Respondent told Draper not to say anything to anybody about it. I find further that the idea of taking [Marlene's estranged husband] and the two men was Draper's, not Respondent's (but that Draper's idea emanated directly from Respondent's suggestion that Draper not break in. Thus Draper took Marlene's estranged husband to trick her into opening the door).

\* \* \*

Respondent is obliged to admit that he advised any number of his clients to perform child snatches, yet he tried to expiate his admission by saying he only meant legal child snatches. By legal, he says he means taking your child *before* there is a court order. He acknowledges, however, he made an "unfortunate choice of words" and he further acknowledges that he is "not saying that it (child snatch) cannot cover an illegal one." His explanation is fanciful and absurd. He is hoist by his own petard.

It is interesting to note that when Draper testified at the March 23, 1977 hearing as to why he snatched the child, he testified that *he went on Respondent's advice.* Thus Draper's exact same version was given before Judge Beardmore [in the child custody hearing in the Circuit Court for Anne Arundel County] *a time when there was no complaint by him against Respondent,* the same version was given before the Inquiry Panel; and the same version was given in instant case. Draper's

> testimony is entirely consistent and credible as opposed to the testimony of Respondent — testimony which is riddled with self-contradiction, inconsistency and illogic. [(Emphasis in original.)]

We have already held that there was clear and convincing evidence to support these findings.

The courts were open for a petition for a change of custody, as Kerpelman well knew, having prepared such a petition. If people are permitted to pick and choose which orders of court they propose to obey, our legal system will soon disintegrate and our government of laws will be replaced by anarchy.

We conclude, therefore, that Kerpelman's conduct in the matter of the child amounted to a violation of DR 1-102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), DR 1-102(A)(5) (a lawyer shall not engage in conduct that is prejudicial to the administration of justice), DR 1-102(A)(6) (a lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law), DR 7-102(A)(7) (a lawyer shall not counsel conduct which he knows to be illegal) and DR 7-106(A) (a lawyer shall not advise a client to disregard a ruling of a tribunal made in the course of a proceeding), as well as DR 1-102(A)(1) (a lawyer shall not violate a disciplinary rule).

## VI Sanctions

There have been no disciplinary actions against Kerpelman in this Court in which he has been adjudged in violation of any of the Disciplinary Rules. Bar Counsel has not advised us of any disciplinary actions in trial courts prior to our assuming jurisdiction of such matters in which Kerpelman was found to have violated the Disciplinary Rules nor has he advised us of any reprimands. Thus, his prior professional record appears to be unblemished. Many times in recent years this Court has quoted from *Ex parte Brounsall,* 2 Cowp. 829 (1778), what has come to be known

as "The Lord Mansfield Rule." It is to the effect that in disciplinary proceedings the inquiry is to whether after the conduct of such individual it is proper that he should continue to be a member of a profession which should stand free from all suspicion, such proceedings not being by way of punishment, but the court in such cases exercises its discretion whether a person whom they have formerly admitted to practice is a proper person to be continued on the roll or not. By the same token, a suspension is for the protection of the public, not by way of punishment of the individual lawyer. It protects the public because it demonstrates to members of the legal profession the type of conduct which a court will not tolerate.

We have before us three separate violations of the Disciplinary Rules: the matter of the Malcomb fee, the matter of the statement to Malcomb that his custody matter had not been concluded when in fact it had been, and the matter of the advice relative to retrieval of Draper's child in disregard of a court order.

Kerpelman's conduct in the matter of his fee and his misrepresentation to his client of the then posture of the proceedings pending in the Circuit Court for Baltimore County represents a type of conduct against which the public is entitled to protection, conduct which brings the legal profession into disrepute. It reflects adversely upon the courts since lawyers are officers of the courts. We have here a finding by the trier of fact that Kerpelman made a wilful misrepresentation to Malcomb as to his fee and that he maliciously and improperly escalated his fee charges to Malcomb without any basis, without any agreement, without any warning, and without the escalated charges bearing any relationship to the amount of work done. We likewise have a conclusion that Kerpelman deliberately misrepresented to Malcomb that there remained work to be done on the case and that Kerpelman was actually engaged in performing such work when no work remained to be done, a misrepresentation made to justify an improper fee.

Although one may infer from the proceedings' here that the Draper matter is not the first and only instance in which

Kerpelman had advised self-help on the part of his clients in disregard of a court order, such other instances may not be used in determining the sanction, he not having been charged with them. *Bar Ass'n v. Cockrell,* 270 Md. 686, 313 A.2d 816 (1974). If Kerpelman were charged with multiple violations of court orders in child custody or other matters under circumstances similar to the case at bar and such charges were proved, we would disbar him forthwith without hesitation. Such contumacious conduct on the part of an officer of the court sworn to uphold the law cannot be tolerated.

We conclude that the proper sanction to be imposed here, taking into account all of Kerpelman's misconduct, is a suspension of two years. Therefore, Leonard Jules Kerpelman shall stand suspended from the practice of law in this State for the period of two years accounting from thirty days from the date of this opinion. He shall stand suspended beyond that date unless and until all costs incurred in connection with this proceeding are paid in full.

> *It is so ordered; respondent shall pay all costs as taxed by the Clerk of this Court, including the costs of all transcripts, pursuant to Maryland Rule BV15 c for which sum judgment is entered in favor of the Attorney Grievance Commission against Leonard Jules Kerpelman.*

## APPENDIX

In his report to us Judge Levin set forth in detail his findings of fact and conclusions of law. He provided a citation to appropriate portions of the transcript for each and every factual statement made. We reproduce a portion of that report as an appendix to this opinion. Although we in our opinion have referred to the Malcomb matter first and the Draper matter second because that is the order in which they appeared in the original complaint, we here set these

matters forth in the order in which they appeared in Judge Levin's opinion. We have eliminated his citations to the transcript. With minor stylistic editing where the matter of money is mentioned, Judge Levin's opinion states in pertinent part relative to the charges before him (all emphasis being his):

## THE DRAPER CASE

**Issue One —**

**Did Respondent agree that his representation of Draper would cost "about $1,000.00" at a time when Respondent intended to charge more based on certain factors including a successful result?**

### Findings of Fact

Draper, age twenty-six at instant hearing, was married to Marlene Boetker (Marlene) on July 29, 1970. One child, Jennifer Britton Draper (child) was born of this marriage on March 19, 1972. On October 15, 1974, Marlene sued Draper for an absolute divorce on the ground of mutual separation and sought custody of the child; Draper admitted all of her allegations by his answer .... On January 7, 1975, Marlene and Draper were divorced absolutely, Marlene was granted custody of the child, Draper was awarded "reasonable rights of visitation" and ordered to pay $25.00 per week child support (Decree).

Draper felt later that the child was living in an "unfit environment" and wanted to "change custody." When he met Respondent in April, 1976 at a meeting of Fathers United for Equal Rights (FUER), he asked Respondent how much Respondent would need "for the case" and he says he was told "about $1,000.00" by Respondent (court costs would be extra). Draper asked Respondent ". . . is that good? You know, is that what I can count on? And he said yes." According to Draper, Respondent also told him he

(Respondent) would need a $500.00 retainer "to start procedures." Shortly thereafter (April 15, 1976), he obtained a $500.00 Money Order and sent "your retainer of $500.00" to Respondent together with the original of the Decree on approximately April 16, 1976. On May 14, 1976, Respondent filed a petition on behalf of Draper, to modify the custody part of the Decree. Repondent specifically signed his (Respondent's) name to the petition which, *inter alia,* stated that the Decree (sought to be modified) "awarded custody of the minor child . . . to (Marlene)."

In the latter part of 1976, Draper received a bill from Respondent (dated July 28, 1976) stating "BALANCE NOW DUE" $460.00 to which he responded by purchasing a Money Order for $460.00 on September 7, 1976. He and Respondent had "set up a date" because Draper wanted to discuss the case with Respondent and so Draper went personally to Respondent's office. When Draper got there, Respondent "wasn't there so I paid his secretary the money." At Draper's request, Respondent's secretary gave Draper a receipt which stated, *inter alia,* "Balance Paid" (he asked "to make sure everything was paid and that I had proof of it").

In August, 1976, Draper heard that Marlene had moved out of Maryland and that the child was living in a "bad environment." He went to Syracuse, New York on August 21, 1976 (where the child and Marlene resided) with Marlene's estranged husband and two male friends and "we rushed in and obtained my child." This retrieval was in flat violation of the Decree. On September 3, 1976, Respondent, on behalf of Draper, filed a "petition for immediate hearing" asserting that Marlene was living with a "boyfriend" charged with rape and breaking and entering "who beat the child" and asked for an immediate hearing (for change of temporary custody) because "this is an emergency situation." Although Draper swore to these "facts" on August 31, 1976, by way of attached Affidavit, neither he nor Respondent informed the court of the illegal child snatch. Thereafter, Marlene filed a petition for contempt on September 30, 1976, asserting that she had moved to New York to "avoid continued harassment" by Draper and that he

"broke into her apartment in Syracuse, New York and assaulted her and snatched the child out of her bed." On March 23, 1977, after hearing, the Decree was modified by granting custody of the child to Draper .... The next day Respondent billed Draper $850.00 for "additional final fee based on fully successful conclusion of case" whereupon Draper wrote Respondent a letter of outrage informing Respondent he did not "intend to pay a cent" and was "taking this matter to the American Bar Association."

In April, 1977, Draper wrote Respondent discharging him as Draper's attorney. (The Court of Special Appeals meanwhile reversed, *Draper v. Draper,* 39 Md. App. 73 (1978), and on remand, Marlene was granted custody of the child by subsequent decree of April 14, 1978 ....) On June 6, 1977, Draper filed complaint with the Attorney Grievance Commission.

The sole dispute is whether Respondent told Draper that the (about) $1,000.00 was a "flat fee" or whether it was a retainer. Respondent contended he had a retainer arrangement and there never was a "flat fee basis." He testified that custody cases are unpredictable and that he rarely represented custody cases on a flat (or "set") fee basis. He argued that when his secretary gave Draper a receipt marked "Balance Paid", she was "newly hired, had not been authorized to determine when any fee was paid in full and had never before given a receipt to a client." He referred to his "temporary note" which purported to show "Retainer fee $950, $500 down" and bill June 23, 1976 which purported to be a bill from him to Draper indicating a "Retainer Fee" of $950.00.

His theory was that there was an "implied contract" between himself and Draper and that it was proper (under a "DR Rule" which he did not number) to charge the additional fee "based on the successful result — that he obtained custody." At other times, Respondent believed he had a "verbal agreement" as to fees.

Draper denied receiving the June 23, 1976 bill from Respondent and when Draper testified at instant hearing,

Respondent did not cross examine him about it. When Draper wrote his letter of outrage to Respondent, he specifically informed Respondent that he had paid Respondent a total of "$960.00 which *you* quoted to me. The total which you want would bring the amount to $1,810.00 which is double and not what was told to me." He told Respondent he *"had* great trust and respect for you . . . but I am very disappointed." Respondent responded to the letter of outrage by his (Respondent's) letter of April 25, 1977 to Draper which expressed surprise that Draper would question the additional $850.00 bill and Respondent was "rather offended" at Draper's suggestion of "overcharging." Yet Respondent nowhere mentioned the June 23, 1976 bill (which would have cleared up the matter, it would seem).

In addition, Respondent's notion of an "implied" contract leaves much to be desired. As an attorney with thirty years experience dealing with a (high school educated) plumber, the client was at Respondent's mercy. He furnished his client with no guidelines as to what future fees would be and the "additional" $850.00 bill was devised solely by Respondent. At no time did Respondent discuss the additional fee with his client before he sent it for payment. A short and simple letter to Draper setting out the fee agreement alleged by Respondent would have obviated any misunderstanding. Respondent's failure to observe the plain common sense of Ethical Consideration 2-19 left much to be desired as has been said.

### Conclusion of Law

Despite all of the highly suspicious circumstances, I cannot find by *clear and convincing evidence* that Respondent intended to improperly charge a fee to Draper in violation of their fee "agreement." Respondent is entitled to the presumption that Draper received the June 23, 1976 bill and Draper's denial of receipt *(by way of answer to interrogatories)* is simply not sufficient to overcome the finding that Respondent sent it and Draper received it. If Draper received it, he was on clear notice that the payment of $960.00 was a retainer and not a "flat fee."

**Issue Two —**

> Did Respondent violate DR 2-110(A)(2) by allegedly refusing to deliver to Draper, the decree of modification (or copy) of March 23, 1977 (awarding custody to Draper — the result sought by Draper and objective in his hiring Respondent) after the modification hearing and after Draper discharged Respondent? Did he further violate said Disciplinary Rule by not avoiding foreseeable prejudice to Draper before he withdrew his representation of Draper and by doing nothing for Draper in the face of danger of additional litigation?

### Findings of Fact

Draper discharged Respondent as his attorney in April, 1977. On May 13, 1977, Marlene's attorney wrote Respondent concerning certain visitation problems. Respondent then wrote Draper, on May 23, 1977, telling Draper to give the matter his earliest attention (he also said he didn't wish to become involved "in any further services upon your behalf" because Draper refused to pay the "reasonable final fee bill"). At all of these times, Respondent did nothing on behalf of Draper. Respondent then filed a form, "Motion to Strike Appearance" on June 2, 1977 and on June 20, 1977, leave was so granted.

Previously, Draper asked Respondent for a copy of the "Decree" (meaning the Decree of Modification whereby the court awarded custody of the child to him). Obviously Draper needed the Decree to prove the legal validity of his custody. Respondent refused stating he would obtain it when the "outstanding" bill was paid. He asserted an "attorney's lien."

## Conclusion of Law

Despite Bar Counsel's contention that Respondent violated DR 2-110(A)(2) (because the fee was outside the scope of their agreement" and hence the attorney's lien was an "improper assertion"), I do not conclude that Respondent did so violate it. When Respondent received the letter from Marlene's attorney, he promptly wrote a letter of alert to Draper. As to the attorney's lien, it is recognized in Maryland. *Attorney Griev. Comm'n v. McIntire,* 286 Md. 87 (1979) as a "passive lien on the papers, securities and money belonging to a client coming into the lawyer's possession." The Court of Appeals in *Ashman v. Schecter,* 196 Md. 168, 173 (1950) also mentions "all papers, securities and money" referring to them as "such things." While the Disciplinary Rules state that the attorney shall "deliver to the client *all* papers" (emphasis supplied), the appellate decisions also state the right of an attorney to retain *all* papers, *id.* at 173. If the purpose of the lien is to protect an attorney from non-paying clients, then it cannot be said that Respondent improperly asserted the attorney's lien.

If I cannot conclude by *clear and convincing* evidence that Respondent charged an improper fee, then I cannot conclude by clear and convincing evidence that Respondent improperly retained the Decree.

**Issue Three —**

**Did Respondent not violate DR 6-101(A)(2) by lack of adequate preparation, in that he never conducted discovery, never interviewed any witnesses nor had in person interviews?**

## Findings of Fact

All of the findings of fact set out [previously relative to the Draper complaint] are incorporated in instant findings of fact.

The face to face contacts between Respondent and Draper were as follows:

a. Brief discussion at FUER meeting in April of 1976 dealing with fee.

b. Twenty minutes on November 18, 1976 when a "merits" hearing on the modification petition was to take place. It never took place.

c. Hearing on modification petition on March 23, 1977.

Other than these, most of Respondent's contacts with Draper were by telephone calls to his staff and letters.

There was only one adversary hearing in the Draper case, that on March 23, 1977 — the matter of Draper's modification petition (when Draper was absolutely divorced, he was not represented by Respondent but by Stanley Sollins, Esq.). After Draper was cited for contempt when he "violated a court order by grabbing the child in New York," there is no record of any hearing on the specific issue of contempt (nor was Draper ever found guilty of contempt).

Respondent produced two witnesses at this March 23, 1977 hearing: Draper and one Bertha Tawney. As to Bertha Tawney, Respondent did not interview her before he put her on the stand. Respondent feels that "personal interviews are not necessary" (of witnesses before trial) nor did he conduct any in the Draper case. He conducted no discovery either, that is, he filed no interrogatories, notices for production, etc., requests for admission, nor conducted any depositions.

The custody report of Judith Finn (a social worker of the Anne Arundel County Department of Social Services) was received in Draper's case. It recommended that Draper receive custody of the child and the trial court, relying heavily on her report, awarded custody of the child to Draper. The trial court would not allow Marlene's attorney to cross examine Ms. Finn during Marlene's case but, on appeal, the Court of Special Appeals stated that "a court appointed investigator in a custody case occupies the position of an officer of the court and at the request of either party, may be called as the court's witness, subject to cross examination by both parties." *Draper v. Draper,* 39 Md. App.

73, 81 (1978) (the trial court was reversed on a different ground). After hearing, the court decreed custody to Marlene on April 14, 1978 and there was no appeal nor have there been any proceedings since then.

While Respondent's representation of Draper is surely not a paradigm of competence or adequacy, this court cannot find by *clear and convincing evidence* that he handled the Draper matter "without preparation adequate in the circumstances."

His failure to interview personally Bertha Tawney, for example, was of obvious detriment to his client because Respondent was forced to claim "surprise" after her first substantive answer. If he had interviewed her (or taken her deposition), he would have known, at the outset, that she was not present at time felt to be significant by Respondent. Actually, the "surprise" rule was not applicable because Respondent had never even talked to his *witness* (he only had talked to *Draper*). The refusal of an attorney to personally interview a witness can logically lead to problems (sometimes severe) because the attorney is left to rely only upon the biased version furnished by his client — a version that may not be true nor accurate. That is precisely what happened with Bertha Tawney because when Respondent claimed surprise, the trial court asked, "This is a different story than what you were previously told?" and Respondent was obliged to reply, "By my *client,* yes" (emphasis supplied). (Respondent wanted to show that when Marlene came to the house with a policeman, the child ran to Draper.) When Bertha Tawney said she was not present at that particular time, Respondent was forced to desist from further questioning. (He never produced the policeman as a witness either.)

In addition, the failure to know what your witness will say in testimony can waste everybody's time: the court's, the witnesses, the attorneys and the parties. It is to be noted that *Respondent* understood the value of discovery as when he remonstrated with an opposing lawyer ... in the Draper hearing ("If you spend a little more time on interrogatories and more preparation, you might be ..."). Respondent asserts

that in custody cases "You don't know how many witnesses the other side is going to produce in a domestic case and particularly in a custody case. You don't know what the facts are going to be, you don't know how they are going to expand by the time the case comes along." However, if he had filed interrogatories, he *would* have known how many witnesses and what the facts would be; if he had interviewed or deposed witnesses, he could prevent them from "expanding." Respondent himself makes out a persuasive case of his own inadequacy.

Nor is Respondent's assertion that he "won the case" convincing. The essence of the trial court's decision to award Draper custody was based upon the social worker's report ("The court relies heavily on the report of Judith Finn and the Department of Social Services," *Draper v. Draper,* 39 Md. App. 73, 77 (1978)). One might say that the *report* won the case for Draper. No matter what was responsible for the "win," it was short-lived in any event because Draper no longer has custody (the trial court was reversed and the child is now in the custody of her mother).

### Conclusions of Law

However, this court cannot find by *clear and convincing* evidence that Respondent's representation was *so* inadequate as to conclude that he violated DR 6-101(A)(2). While Respondent's failure to utilize obvious tools was probably dictated by his desire to avoid costs (he claims he would have to pass on such costs to his clients) the line between trial tactics and adequacy of preparation can sometimes be blurred. Experts in the field of family law feel that the "first interview" is of tremendous significance. They advise *office* interviews of a minimum of one to two hours uninterrupted by any distractions.

Contrast that with Respondent's telephone theory, "It is totally unnecessary for human beings to communicate information one to the other, that they be in the same room and it has not been so since the invention of the telephone and in fact far before." In fact, Respondent is apparently proud of his lack of office interviews even boasting that some of his *clients* "never see him until the day they go to court."

Respondent's irresponsible boast that some of his clients never see him until the day of trial can easily backfire on him. In fact, conduct even less reprehensible may subject an attorney to malpractice. *Compare Bevevino v. Saydjari,* 76 F.R.D. 88, 96 (S.D.N.Y. 1977) (attorney's failure to prepare defendant's doctor for his deposition prevented him advancing a valid defense — court suggests malpractice suit to doctor). On the other hand, the conscientious attorney must not be required to spend his (and his client's) money needlessly. Nor should there be overdiscovery. J. L. Ebersole, *Discovery Problems: Is Help on the Way?* 66 A.B.A. J. 50 (Jan.,1980). But note the word "conscientious" however. This should require, *de minimus,* an effort to inform the client and involve him in decisions about discovery. Regular discussion will not just make it harder for clients to complain later, but will generate sympathy for the attorney who treats his client as a person in a mutual undertaking rather than as a child. While a *reasoned* decision as to whether to pursue a particular avenue of discovery is within an attorney's discretion, *Identiseal Corp. v. Positive ID Systems,* 560 F.2d 298, 302 (7th Cir. 1977), certainly the *total* absence of discovery may well be outside the bounds of discretion. *See generally* W. Barthold, *Negligence in Discovery: No Paper Tiger,* Litigation, vol. 6, Fall 1979 at 39.

It must be noted, however, that Bar Counsel has specifically dropped the "neglect" violation against Respondent leaving only the inadequate preparation charge. Since Respondent knew he had a favorable report from the Department of Social Services and since he may have anticipated that the judge might be favorably impressed by the neutral and experienced source, it cannot be said that he was required to have prepared additionally. I really cannot conclude by clear and convincing evidence that Respondent has violated the latter rule *under the circumstances.*

Moreover, the "inadequacy" Disciplinary Rule nowhere spells out any guidelines for instruction in this Orwellian field, Brown, *ABA Code of Professional Responsibility: In Defense of Mediocrity* 5 Valparaiso L. R. 95, 99 (1970), and before one may find *punishable* inadequacy, a stronger case must be presented. Some observers feel attorney conduct

must reach proportions of grossness. 24 Hasting L.J. 675, 693 (1973), while others feel the standard of care may be more closely akin to negligence. Zilly, *Recent Developments in Legislative Malpractice Litigation* (*Litigation*, Vol. 6, No. 1, Fall 1979 at 8, 17, 64). The American Bar Association Committee on Ethics and Professional Responsibility declined to give meaningful responses to various questions that could have provided a more workable definition. The "inadequacy" Disciplinary Rule is vague and general. Canon Six's *Ethical* Considerations nowhere enlightens us as to the meaning of "inadequacy." No mention is made of duties of investigation and preparation, conferring with the client "early and often," frequently advising him, ascertaining and developing strategies, filing appropriate motions (to produce, to request admission of genuineness and authenticity), the duty to personally interview clients and witnesses and the duty to file interrogatories and when necessary, take depositions. One wants to raise the competency of attorneys to at least a minimum level but one also worries about the lack of specificity of the inadequacy Disciplinary Rules. See generally Morgan, *The Evolving Concept of Professional Responsibility,* 90 Harv. L. Rev. 702 (1977).

In sum, while Respondent's representation was spotty and somewhat deficient, this court cannot find by *clear and convincing evidence* that Respondent handled the Draper case without preparation adequate in the circumstances.

**Issue Four:**

**Did Respondent violate any Disciplinary Rule by advising Draper to retrieve (meaning illegally child snatch) the child from Syracuse, New York in flat violation of an unmodified court decree awarding custody of the child to Draper's former wife (mother of the child)?**

**Findings of Fact**

The Decree of January 7, 1975 unequivocally granted

Marlene custody of the child with reasonable visitation rights to Draper. From January 7, 1975 to August 21, 1976, there was no modification of the Decree. Draper met Respondent in April, 1976 and retained him to "change custody" because he felt the child was living in an "unfit environment." After Draper paid Respondent his fee, Respondent filed a petition for modification on Draper's behalf on May 14, 1976, asking that Draper be awarded custody. On May 17, 1976, the court, per the clerk, issued an Equity Subpoena to Marlene at 139 Rigi Avenue, Syracuse, New York 13206 (to Answer or defend).

In early August, 1976, Draper was told by his former mother-in-law that Marlene had moved out of the state and that she was living with a criminal. Draper twice consulted with Respondent on the telephone in early August, 1976 asking him if "something could be done about this." Respondent suggested that Draper get the child "but not to say anything to anybody about it, because it was not the procedure of attorneys." Respondent told Draper [, according to Draper,] that when he went, "not to make it a breaking and entering charge type of thing but to try to get in without breaking the door down, and, you know, just get my child." Respondent also told Draper that if he (Draper) were successful "we might get a faster response from the court" and that it might show "good concern on my part." On August 21, 1976, Marlene was living with the child in Syracuse, New York (and a man named Jerry Cushman — later convicted of breaking and entering).

On that date, Draper went to Syracuse, New York with the estranged husband of Marlene ... and two other males ("case her boyfriend gave us some trouble") and "we rushed in and obtained my child" (from her bedroom).

On September 3, 1976, Respondent filed, on Draper's behalf, a petition for immediate hearing asking for a change of temporary custody "because this is an emergency situation." He mailed it to Marlene on August 31, 1976 just ten days after the child snatch. The upper left of the petition indicates it was typed three days after the child snatch

(August 24, 1976). Neither Respondent nor Draper advised the court of the physical seizure of the child. On September 30, 1976, Marlene petitioned to hold Draper in contempt and on the same date, the court . . . ordered Draper to return custody of the child to Marlene pending litigation of the matter of modification. On March 23, 1977 after hearing, the trial court awarded custody of the child to Draper . . .; his decree was reversed by the Court of Special Appeals, *Draper v. Draper,* 39 Md. App. 73 (1978); and on April 14, 1978, the trial court . . . awarded custody of the child to Marlene with reasonable rights of vistitation to Draper. The matter thus came full circle.

I find as a fact that on May 14, 1976, Respondent knew of the Decree. Aside from the fact that Draper sent it to him in April, 1976 when he paid Respondent his fee, the petition for modification prepared, drawn and filed by *Respondent,* "moves that this court modify its Decree concerning child custody," says the parties were divorced by "Decree . . . dated January 7, 1975" and prays the court to modify "its" Decree. Although Respondent seemingly denied seeing the decree till he gave his deposition (in the instant case in 1979), he acknowledged that "this was besides the point, because my notes show that the wife had custody" and "that would sort of indicate that Mr. Draper would very well have given me those papers, but at any rate, I was accurate that Mr. Draper's wife had custody."

I find as a fact that in August, 1976, Respondent did suggest to his client, in flat violation of the Decree, that he (Draper) physically take the child from the Syracuse residence where she was living with her mother; that it was Respondent's and not Draper's suggestion; that Respondent told Draper to not make it look like a breaking and entering but just to get the child; that if it was successful, "we" might get a faster response from the court and it would show good concern on Draper's part; and that Respondent told Draper not to say anything to anybody about it. I find further that the idea of taking [Marlene's estranged husband] and the two men was Draper's, not Respondent's (but that Draper's idea emanated directly from Respondent's suggestion that

Draper not break in. Thus Draper took Marlene's estranged husband to trick her into opening the door).

At first, Respondent denied that he had advised Draper between April, 1976 and August 21, 1976 that he should "retrieve" the child then in Marlene's custody as per the Decree ((i) "False. The Respondent does not remember using any such quoted imprecation to Mr. Draper . . ."). However, he later shifted ground, admitting he *had* used the word "retrieve."

I find as a fact that Respondent testified before the Inquiry Panel on January 28, 1978 as follows:

1. ". . . when you have performed a child snatch, as any number of my clients, on my advice, have done . . ."

2. ". . . Now we had that hearing and then — oh, before that I had planned carefully with Mr. Draper just how he was to retrieve the child. Well, first of all, whether to retrieve the child and the answer to that was clear. And we planned how to retrieve the child."

3. "I think I did more than he realizes. There was the pre-planning, there was the snatch, there was this first hearing."

Despite the Respondent's protestations that when he said "retrieve" what he really meant was to *legally* retrieve, his testimony is fatuous and entirely unconvincing. He testified that in his view, retrieval means:

"the legal plan, the pleadings that would be filed, the setting of having the case brought promptly before a judge, also the legal possession that would be established that Mr. Draper, having a right to reasonable visitation, which has been denied him, had a right also. This legal position is what was carefully planned on retrieving the child, that is, retrieving the child back into his court ordered custody is what I'm talking about. I'm talking about getting the child ordered by the court in a decree to be turned over to the custody of Mr. Draper."

He testified further that:

"I was planning with him, and preparing myself, for the legal position that since he had the right to reasonable visitation and since the child was being held with a promiscuous mother, living in the same [home] with an alleged felon, that for him to ask to take the child back from here for his visitation is one thing he could have done, that was part of the planning ... Another part of the planning was to try to get an immediate court order concerning return of the child."

However, it is clear that a commonsense view of Respondent's (Inquiry Panel) use of the word "retrieve" is that he meant to *physically take* the child. Aside from common sense, Respondent (himself) *invariably* uses the word "retrieve" to mean *take:*

1. "I'll have to ask the court to bear with me. I'd been here about ten minutes early, and at that time was unable to retrieve my files."

2. "Did I throw them in the waste basket? Have I retrieved them from the garbage dump or what?" (Respondent is the questioner).

3. "Q. How were they brushed aside physically, you tell us.

 "A. You put your hand out and pushed them aside.

 "Q. Where did I push them to?

 "A. It would have been over in front of me or over towards the center of the table.

 "Q. Did I then use those notes later in the trial or not?

 "A. I don't believe so. You may have. I don't believe you used those in the way I'm talking about.

 "Q. Did you retrieve them?

 "A. Did I what?

"Q. Retrieve them?

"A. Oh. Thank you. No sir. You retrieved them. You showed them in court."(*Respondent* is the questioner).

4. "He goes and retrieves his child . . ."

5. "Just that at the time the child was retrieved . . ."

6. "Yesterday evening I went down to my basement and was able to retrieve a file."

7. In his deposition, he testified that "Draper has been on the risk to retrieve the child* from New York" but "explains" that "it was not a careful and an accurate use of the word."

His labored and tortured attempts to explain away his earlier sworn *testimony* (before the Inquiry Panel) are totally unconvincing. He refers to a Random House dictionary definition but must acknowledge that the first definition is "recovered, regain." He then twists the word to mean that Draper was trying [to] retrieve his visitation right. *Draper,* however, clearly stated that the purpose of the child snatch was *to remove the child from the bad environment (not visit)* . . . .

If he meant "retrieve" in the sense of obtaining a valid court order, he does not explain why there was no hearing *before* Draper retrieved the child. As to the petition for immediate hearing, it was filed *after* the retrieval thus further negating Respondent's motion of *legal* recovery. Respondent speculates that the petition could have been dictated before the retrieval but here too his position is unconvincing. If indeed his secretary was slow in typing this petition, surely Respondent would have known when he filed it (September 3, 1976) that the retrieval had already taken place. Respondent tries to argue that the petition was sent to Draper for his signature but one wonders why such a slow

---

* Respondent's use of "retrieve" in his everyday use is thus equated with his use of "retrieve" as concerns Draper's *physical taking* ("on the risk to *retrieve the child"*) (emphasis supplied).

process was used if there was such an emergency. I find as a fact that Respondent knew of the retrieval (on August 21, 1976) at the time he filed the petition for immediate hearing (September 3, 1976). If Respondent's *legal* theory is correct, why would he not have obtained a *signed* court order in Maryland awarding temporary custody to Draper so that the New York authorities could honor it? In fact, Respondent offered into evidence exactly such an order but it was never signed by any court because it was never presented to any court.

Respondent's visitation theory is totally unsupportable and totally unconvincing. A non-custodial parent simply cannot take three men with him and physically grab a child out of her bed because he feels the custodial parent unfit. If he does so, *his* visitation rights may be completely denied. *See Friedland v. Friedland,* 174 Cal. App. 2d 874 (father told friend "one way or other we will get the child" and had on several occasions broken into the custodial mother's home — visitation denied). Even if vistation rights are not denied (*Anderson v. Martin,* 257 S.W.2d 347 (Tex. Civ. App. 1953)) *reasonable* visitation is not to be equated with a bald and illegal child snatch.

Respondent is obliged to admit that he advised any number of his clients to perform child snatches, yet he tried to expiate his admission by saying he only meant legal child snatches. By legal, he says he means taking your child *before* there is a court order. He acknowledges, however, he made an "unfortunate choice of words" and he further acknowledges that he is "not saying that it (child snatch) cannot cover an illegal one." His explanation is fanciful and absurd. He is hoist by his own petard.

It is interesting to note that when Draper testified at the March 23, 1977 hearing as to why he snatched the child, he testified that *he went on Respondent's advice.* Thus Draper's exact same version was given before Judge Beardmore *at a time when there was no complaint by him against Respondent,* the same version was given before the Inquiry Panel; and the same version was given in instant case.

Draper's testimony is entirely consistent and credible as opposed to the testimony of Respondent — testimony which is riddled with self-contradiction, inconsistency and illogic. It is further interesting to note that when Respondent himself alluded to the fact that his client Draper testified that he (Draper) acted "on counsel's advice," Respondent did not contradict Draper at all. In fact, he (Respondent), suggested "it was an emergency situation ... he (Draper) was doing the right thing."

On direct examination, Respondent testified that he *never* advised a client to child snatch if there is a court order. However, Bar Counsel produced a former client of Respondent's (William Brecka) who testified that when he asked Respondent to represent him, Respondent told him in December, 1975, he would have to dismiss his then attorney, have a fee of $850.00 or $950.00 and "would have to be willing to do anything that was necessary to get custody of the children." When Brecka pointblank asked Respondent what he meant, Respondent replied "I will deny it if I am asked, but you have to get the children and keep the children and go as far away as possible and stay away as long as possible." When Brecka told Respondent he was going to take the children to Charleston, South Carolina, Respondent told Brecka "Don't tell me, I don't want to know. Just tell me when you're going." (Brecka did take his three children to South Carolina and kept them in Charleston for five or six weeks but flew back to Maryland, the children returning with their mother).

Respondent felt this evidence was inadmissible. However, a witness may be contradicted on collateral matters that are relevant to the issue on matters brought out in direct examination of the witness. *See generally* 98 C.J.S. *Witnesses,* Sec. 633 at 653 [(1957)]. It was Respondent who first testified on direct examination that he had never advised a client to child snatch if there was a court order, thus offering his probity and consistency for the consideration of the trier of fact. Surely Bar Counsel can try to contradict particularly when the matter of child snatch and child custody constitute the basic issue. *Cf., Walder v.*

*U.S.,* 347 U.S. 62 (1954) (on direct examination, defendant said he had never sold narcotics in his life; in rebuttal, government allowed to produce officer to testify he had seized heroin from defendant's home at unrelated time); *see also U.S. v. Epps,* 438 F.2d 1192 (4th Cir. 1971); *Krider v. Hempftling,* 137 S.W.2d 83, 86 (Tex. 1940) (where one party offers evidence in regard to irrelevant matter, other party may not only inquire about it but he is entitled to offer evidence otherwise inadmissible).

Brecka also testified that Respondent "would, occasionally step over the line of from walking that fine line right on the edge of the truth or truth if you wish to put it that way, stepping over and stepping back" and "he is basically truthful, with a reservation that he would not tell you the whole truth and that he could lie but on balance, he is truthful." Brecka was a self-employed building developer. He, other members of FUER and Respondent went to FUER meetings in Baltimore City, Howard and Montgomery Counties. The Brecka testimony was admitted solely for the purpose of credibility and has not been considered substantively. Finally, the evidence against Respondent is so overwhelming otherwise, that even if the Brecka testimony were inadmissible, it would make no difference at all.

## Conclusions of Law

This court finds by clear and convincing evidence that Respondent's conduct was in violation of Disciplinary Rules 1-102 (A)(1), 1-102(A)(4), 1-102(A)(5) and 1-102(A)(6).

### 1-102(A)(4)

A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

He practiced a fraud on the court which issued the decree of January 7, 1975 by suggesting, planning and helping to carry out an illegal and invalid child snatch in violation of the decree. He encouraged his client to violate the decree and he filed pleadings designed to consummate the violation.

### 1-102(A)(5)

A lawyer shall not engage in conduct that is prejudicial to the administration of justice.

Respondent's conduct in calculatedly planning the violation of the decree is obviously conduct prejudicial to the administration of justice. Illegal child snatching has reached epidemic proportions (Baltimore *Daily Record,* February 5, 1980, vol. 184 No. 30 at 1) and conduct such as Respondent's strikes at the heart of the administration of justice. *Respondent* himself is aware of this ("The purpose of establishing Courts ... is to prevent ... people from engaging in self help. In the old days before there were courts, people would shoot each other . . . this is uncivilized.)

### 1-102(A)(6)

A lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law.

Respondent's conduct quite clearly reflects on his fitness to practice law. For partisan purposes, he flouts the law. In so doing, Respondent tramples on the rights of the custodial parent and brutally deprives her of her child on the mere say-so of the non-custodial parent. The non-custodial parent — spurred on by Respondent — takes a young child without affording the custodial mother a chance to be heard. For her, due process is non-existent. Respondent also bulldozes the courts whose decrees are reduced to a nullity by him. Respondent's mentality leads him to conclude that "court orders are not holy writ." While they are obviously not, they must be obeyed for the clear reason that if everybody did what Respondent did, chaos would surely ensue.

### 1-102(A)(1)

A lawyer shall not violate a Disciplinary Rule.

Since the above Disciplinary Rules have clearly been violated, Respondent has therefore violated above Disciplinary Rule (a lawyer shall not violate a Disciplinary Rule).

Finally, I find by *clear and convincing evidence* that

Respondent violated Disciplinary Rules 7-102(A)(7) and 7-106(A). (See [prior] discussion).

## THE MALCOMB CASE

**Issue One: Did Respondent violate any Disciplinary Rules by making an agreement with Malcomb that his representation of Malcomb would cost $1,000.00 and yet intended, at the time of the agreement, to charge an additional fee based on certain factors, including a successful result?**

### Findings of Fact

John D. Malcomb (Malcomb) . . . was formerly married to Merle Burgess (Merle) on July 14, 1963 and two girls were born as a result: Kirsten, born April 26, 1965 and Heather, born April 13, 1968. In March, 1973, Malcomb and Merle separated and on March 29, 1974, they were absolutely divorced. The Decree provided that the custody of the children was awarded to Malcomb with the right to Merle to visit at reasonable times. Their separation agreement of January 16, 1974 was made a part of the Decree and it stated, in pertinent part, that Malcomb should have custody of the two it being agreed that Merle

> "is not waiving her right to the custody . . . but that both . . . feel that it would be to the best interest of the children at this time if the two children . . . were in the . . . custody of (Malcomb). (Merle) reserving the right to take custody of the two children at such time as her situation may change and as long as it will be in the best interest of the children."

. . . In November, 1974, Malcomb remarried (Kathleen).

In December, 1974, Merle (who had also remarried) had an attorney write Malcomb that she wanted to regain custody of the children and Malcomb selected Respondent to represent him. Respondent wanted a $500.00 retainer which

Malcomb sent him. Respondent sent a copy of Respondent's letter to Merle's attorney (a Mr. Pryor) to the effect that Malcomb had no intention of changing the agreement. Since Kathleen was ill, Malcomb decided not to continue with the case and Respondent agreed (to drop the case) and sent a $200.00 refund to Malcomb in early January, 1975.

In the Fall of 1975, Merle tried to keep the children from Malcomb who then consulted a different attorney (Richard G. Bartholomee, Esq.). Over the Thanksgiving holiday of 1975, Malcomb had let the children visit with Merle but Merle insisted on keeping Heather contending she was ill (Malcomb did get Kirsten back). Malcomb became suspicious and called the doctor who said Heather was not ill. Although Malcomb again consulted Bartholomee, he did not react adequately, according to Malcomb. Malcomb then contacted Respondent to represent him to get Heather back.

The above constitutes undisputed facts. The following paragraph constitutes Malcomb's contention (disputed by Respondent). Respondent said it would be an uphill battle "and it is going to cost you $1,000.00." Respondent agreed to accept $500.00 in a few days, the rest in a couple of months "as long as I paid him the whole amount before the thing came to court."

It is undisputed that after Malcomb paid Respondent the $1,000.00 (received by Respondent on December 16, 1975, February 11, 1976 and April 6, 1976), Respondent's bookkeeper marked the deposit "Paid in Full."

It is undisputed that Respondent then sent Malcomb a copy of a letter from the court (re trial on April 30, 1976) with a typed note from Respondent stating, *inter alia,* that "It would be appreciated if the balance of my fee [$500.00 bal] could be paid before trial." Malcomb then sent the additional money as the result of receiving that document.

It is undisputed that the April 30, 1976 hearing was reset for June 8, 1976. On that day, the hearing took place (Judge H. Kemp MacDaniel presided) and lasted one day. The judge did not reach a decision that day. Respondent sent Malcomb a $650.00 bill dated June 23, 1976 marked "Further retainer" received by Malcomb on the 25th "probably."

Malcomb contends he disagreed with the bill and intended not to pay it but he felt that with Respondent's attitude and the problems he had, "it was best to at least pay a token amount and then discuss the rest . . . of the fee with him after Judge MacDaniel had made his final decision." He paid him $50.00.

It is further undisputed that sometime after June 23, 1976, Respondent sent to Malcomb a copy of a June 23, 1976 letter from Respondent to Judge MacDaniel confirming that the hearing set for July 12, 1976 would be instead on Tuesday, July 20, 1976 . . . (attached was a note dated June 21, 1976 from the judge stating that on "June 8, 1976 a hearing on Petition for Modification of Decree and Petition to return child held sub curia pending further evaluation by the court . . .)".

Malcomb contends that because the June 23, 1976 letter had a note by Respondent asking Malcomb to call him (Respondent), he attempted to contact Respondent but he was not able to. He waited several days after the July 20, 1976 hearing date, but didn't hear from Respondent. He attempted to call him but was not able to reach him so he called Merle and asked her if she had heard anything about the decision. Merle said, "Of course, don't you talk to your attorney? The judge gave me custody of Heather and you keep Kirsten and you pay me $25.00 a week support" (meaning for Heather). Malcomb also called Merle's attorney (William Hammond, Esq.) (Hammond) "because I wanted to get it from a totally credible source."

On July 27, 1976, Malcomb and Kathleen saw Respondent at a meeting of FUER at a church in Baltimore and he contends Respondent said:

> Oh, Mr. Malcomb, I have been meaning to call you, that I am still working on the case. And I said, Working on it? I thought it had been settled? He said, Settled? Nothing is ever settled. It is still up in the air. It is touch and go. I have been meeting with the Judge and trying to get it worked up. You know,

Judges are very reluctant to divide custody of children.

Malcomb contends he was confused and so the next day (July 28, 1976), he called Judge MacDaniel's office to talk to the judge's secretary (to ascertain if a decision had been rendered). Actually, the judge answered and although he was reluctant to talk with Malcomb, Malcomb explained the situation and asked one question, "did you make this decision on the 20th of July and was this your decision." The judge told Malcomb "yes." The next day, Malcomb called Respondent who told Malcomb he had talked to Judge MacDaniel that day (July 29, 1976) and the judge told Respondent that he was ready to sign an order giving Malcomb custody of one daughter and Merle custody of the other "if I was willing to pay $25.00 a week support." Malcomb told Respondent he (Malcomb) had already agreed to that "as he (Respondent) knew" whereupon Respondent became very agitated and angry. Malcomb was finally able to calm Respondent down and after he asked Respondent what to do, Respondent said he felt $25.00 was outrageous and we ought to request another full scale hearing to reduce support because of Merle's earning capacity. When Malcomb asked Respondent why Respondent hadn't contacted Malcomb about the outcome of the case, Respondent became very belligerent and said, "I never did like you, you little bastard . . . you are just trying to get out of paying my fee." He threatened suit and slammed down the phone.

It is undisputed that Malcomb was quite angry and wrote Respondent a July 29, 1976 letter pointing out that since Respondent knew full well that the judge's ruling (Kirsten to Malcomb; Heather to Merle; $25.00 per week child support for Heather to be paid by Malcomb) "was the precise arrangement that I had been trying to work out for almost a year . . . you knew . . . I was willing to share the custody with Merle . . . I only went to court when she tried to take both of the children." Malcomb further accused Respondent of a contemptible and brazen attempt to string him along after Judge MacDaniel had made his decision on July 20, 1976 and saw no reason to continue "our relationship." He

informed Respondent that since he had paid Respondent "Your fee of $1,000.00 (which you quoted to me on the phone and insisted be paid before the June 8 hearing)" he saw no reason to honor the "further retainer" of $650.00.

It is further undisputed that the very next day (July 30, 1976) a letter was sent by Respondent to Judge MacDaniel enclosing a copy of a proposed Order endorsed "approved as to form." He explained that the reason for his "slight delay" was to discuss with Malcomb the support provision ("to permit him to reflect" since Respondent found the "fact situation" quite equivocal as to whether Malcomb had to make any payment for support) and to have Malcomb's decision in writing. Respondent told the judge he understood Malcomb called him (the judge) and suspected he said a number of "derogatory" things about Respondent. He then stated that Malcomb "has his own highly personal reason for wishing to have this order signed *in haste* and which I do not wish to discuss further."

It is Malcomb's contention that there was no "discussion" as mentioned in Respondent's July 30, 1976 letter (except for Respondent's mentioning the $25.00); and as to Respondent's statement that he "was taking the time to transmit to him and receive back a communication," Malcomb testified there were no communications at all.

The following is undisputed, namely, that Respondent then sent Malcomb an August 3, 1976 letter stating that although Malcomb was willing to pay $25.00 per week for Heather's support, Respondent felt the requirement to do so to be "entirely unreasonable and unfair" (because of Merle's earning capacity of around $10,000.00 and her husband's salary). He asked Malcomb to confirm in writing his acceptance of Judge MacDaniel's "proffered ruling." Two days later, he sent his client, Malcomb, an August 5, 1976 letter stating that the custody case was concluded "tenuously" (and "custody is always subject to the further jurisdiction of the court") because he (Respondent) was highly surprised that the court awarded Malcomb custody of one child because of evidence of homosexuality and recent "gay" pornography photos and Malcomb "having been nude

in the bathtub with this child." (However, *Judge MacDaniel* did not seem to view these matters as seriously as Respondent. The judge said, "There is nothing that the mother of this child proved against the father that in my opinion makes the father an unfit person. She brought out a homosexual situation that happened prior to the time of the marriage and some pictures that were looked at afterwards, but there is no concrete evidence of anything that developed into a problem with these children.") Respondent warned Malcomb the custody award of one child had to be "protected very carefully" and therefore his bill for "further proceedings" was for doing just this including the matter of child support. He said he did "not believe that $650.00 is an 'excess' [*sic*] charge for an attorney to make in seeking to avoid liability of his client for $13,000 payment" and then warned Malcomb not to write any "further neurotic letters to the judge unless you wish to endanger your award of custody."

Malcomb's contention was that in the June 8, 1976 custody hearing before Judge MacDaniel, Merle had raised fully the matter of homosexuality. He acknowledged such activity but testified it occurred before his marriage to Merle (in 1962). He denied recent "gay porno" photos stating he "apparently had gotten on a mailing list" and received several (postage stamp sized pictures) over a period of several weeks. As has been seen, it was *Respondent* — and not Judge MacDaniel — who viewed these matters so seriously. One wonders why Respondent made these threats upon his client and why Respondent felt so threatened.

The following matters are undisputed, namely, that Malcomb had already paid Respondent $1,000.00 plus $50.00 on the $650.00 bill but had refused to pay the remaining $600.00. Respondent then sent Malcomb on August 26, 1976 bill for $1,850.00 listing a "previous balance" of $600.00 plus another $1,000.00 for "Additional final fee based on successful result." There was no conversation nor discussion between Malcomb and Respondent before Respondent sent the latter bill and Malcomb did not pay it. Respondent next sued Malcomb for $1,850.00 in the Towson

District Court on October 4, 1976 asking for summary judgment. He filed an Affidavit that "there is justly due and owing by the defendant to the plaintiff the sum of $1,850.00" and attached the August 26, 1976 bill. Respondent then sent Malcomb another bill dated October 29, 1976 this time for $2,250.00. He listed $1,250.00 for "additional final fee based on successful result" and then added another $1,000.00 for "Re-analyzation of file, further additional fee based on time expended." At no time, did Respondent discuss the additional $1,000.00 with Malcomb nor did Respondent advise Malcomb of the basis for the $1,000.00. Malcomb did not pay. Respondent then sent Malcomb another bill dated February 11, 1977 this time for $2,850.00. It was a "Revised and Corrected Bill" which added $600.00 ("previous balance"). Malcomb did not pay. Five days later (February 16, 1977), Respondent filed an Amended Statement of Claim for $4,262.00 alleging an "implied contract, to pay reasonable charges for legal services rendered, and such services were rendered according to the attached plaintiff's Statement of Claim Exhibit 1." This Exhibit consisted of five handwritten pages of alleged work plus the alleged time for the various alleged items of work (it also includes the previous billings) (*Although Respondent charged Malcomb for two trial days "at $950.00 per day" it is undisputed that there was only one trial day*). Respondent then sent Malcomb a March 21, 1977 bill for $4,262.00 marked "*Corrected Bill* — Based on 'File Analysis' done in January, 1977." In April and May, 1977, Respondent sent "Balance Now Due" bills of $4,262.00 to Malcomb. Malcomb did not pay.

Respondent's contention was that the $1,000.00 paid by Malcomb was only a retainer and that when Malcomb was awarded custody of one child, Respondent sent him a bill for a "modest fee which was in keeping with my agreement with him, which was, that the prior payment was a retainer fee and that the total cumulative payment would be determined at a later date." As to the "Paid in Full" bill issued to Malcomb by his (Respondent's) bookkeeper, Respondent

testified that she had "just about full independence;" that "he did not supervise the books;" that he had "difficulties about the wording, of the bills around the time" he was representing Malcomb; that he told her she must be careful. Thus he contended that she would use "Paid in Full" for her own "personal convenience" to refer to *any* bill with a flat fee or retainer. He contended that Malcomb initially wrote asking how much would Respondent require in the way of a retainer and he billed him first stating "Further Retainer" of $1,000.00.

As to the various fee demands (from $650.00 to $4,262.00), Respondent claims that the $1,250.00 bill was based on the "successful result" of the Malcomb case; the $1,850.00 was Respondent's "total additional claim"; then "upon review of his file, however, Respondent realized that his initial billings did not reflect the value of the actual work performed. Having decided to sue on a *quantum meruit* basis, he revised the estimated value ... upward by $1,000.00;" the "third additional bill" was for a "reanalyzation of file, further additional based on time expended resulting in total additional claim of $2,250.00;" then, in preparation for the District Court trial (by then Respondent had sued Malcomb), Respondent estimated he had done 36.8 hours worth of work (exclusive of trial time) which he multiplied by $90.00 per hour and added his standard fee for two days ($950.00 per day) and arrived at his figure of $4,262.00. At that, Respondent feels he "undervalued" his services.

Respondent put on his wife who testified that Respondent had a lot of telephone conversations with his clients and she heard him invariably talk about retainers. It was his habit. (However, he sometimes charges "flat fees" in custody cases).

I find by clear and convincing evidence that Respondent agreed with Malcomb to represent Malcomb for $1,000.00 and no more and that the agreed $1,000.00 was not a retainer. The evidence is overwhelming. Respondent's own note to his own file "made at the time of the initial agreement by Respondent in December, 1975" states "Fee

"$1,000.00" and under that "retainer" and under that "$500.00 down" and under that "rest of it in a month or so." Although Respondent tries to minimize *his own note* (by terming it "unpunctuated" and by calling Bar Counsel's interpretation of it "subjective"), this note coincides with Malcomb's version entirely . . . . Moreover, when Respondent advised Malcomb of the date for trial, Respondent wanted the *balance* of his fee "($500.00 *balance*)" to be "paid before the trial." He cannot blame *this* writing on his secretary because the request for the "$500.00 balance" was his own dictation with his own initials ("L.K."). Again this coincides exactly with the testimony of Malcomb. Respondent's February 18, 1976 bill to Malcomb indicates "Balance Now Due . . . $500.00" and his March 18, 1976 bill also indicates "Prior Balance $500.00 Paid February 11, 1976 $50.00 Balance $450.00."

Malcomb's testimony was straightforward and consistent whereas Respondent's was variously evasive, inconsistent and misleading. The escalation of fees by Respondent was incredible. He was quick to charge Malcomb an additional $650.00 fee two weeks after the June 8, 1976 hearing but — when Malcomb would not pay it, he increased his bill to $1,250.00; then $1,850.00; then $2,250.00; then $2,850.00 and finally $4,262.00.

His excuses were farcical. He sued Malcomb in District Court and filed an *Affidavit certifying* that $1,850.00 was *the* sum owed by Malcomb. Yet he later sent a higher bill for $2,250.00 claiming "reanalyzation of file." One would assume that when an experienced attorney of thirty years of practice sues his client for a fee that the attorney would at least know how to sue for the right amount. Respondent claims he did not sue too many of his clients so the normal thing for him to have done, would have been to analyze his file carefully before suit and then insert the proper amount. However, despite the fact that his previous affidavit certified that the sum for which he sued was "justly due and owing", he then further amended it up to $4,262.00.

When Respondent sued Malcomb for the $4,262.00, he purported to inform the court of the basis for that ($4,262.00)

figure by attaching a "File Analysis." This analysis listed, *inter alia,* "two trial days at $950.00 per day — $1,900.00." *However, at the District Court, when Respondent saw that Malcomb's attorney had produced the attorney (Hammond) who had opposed him (Respondent) at the trial in question (on June 8, 1976), as a potential witness, Respondent then admitted the trial took only one day.* (Malcomb testified that although Respondent listed a number of conferences, there was only one and Respondent's updated entries did not agree with his records and "I felt he was billing me . . . for other work that he didn't do.") *Respondent's* testimony about his "work" is spotty and vague.

It is undisputed that Respondent never discussed any of his escalating bills with Malcomb beginning with the $650.00 bill. He simply sent them to Malcomb. As to Respondent's August 26, 1976 bill of $1,250.00 ("Additional final fee based on successful result,") if the July 20, 1976 conference (at 2:00 P.M.) with Judge MacDaniel left matters so up in the air as Respondent contended ("subject to all sorts of wavering winds of change . . . open at that time, was the question of whether Malcomb should pay support, it was still open to contest"), why would Respondent charge Malcomb an additional fee for "successful result?" According to Respondent, he felt that the July 20, 1976 decision reached by Judge MacDaniel (requiring Malcomb to pay $25.00 per week as support for Heather) was "unreasonable and unfair" and felt it would be "preferable to have a formal hearing." Obviously, in Respondent's mind, this could not be called a "successful result" under such unfair circumstances even if Malcomb did retain Kirsten (whom he had before Respondent came to represent him).

Respondent further attempted to justify the $650.00 fee which he said was not excessive when the arithmetic of it was considered (meaning Respondent's theory of a total dollar saving of $13,000.00 to Malcomb). However, this attitude was at best a naive and forlorn appeal to (by then) a totally disenchanted client and at worst a crude and dishonest effort to bulldoze Malcomb into submission. (The only way Malcomb could save $13,000.00 was to pay *nothing*

for the support of Heather — something he never wanted to do.) He was perfectly content to pay this weekly sum for his child's support (as he *had been doing before he consulted Respondent*) as he told Respondent on a number of occasions. Respondent was aware of this. Despite Merle's earning *capacity* (she was *not* then employed) and marriage, it was decidedly unrealistic to expect any court to not require a father (earning near $22,000.00 per year — as per Malcomb's answer three to Merle's interrogatory — as prepared by *Respondent*) to pay *something* for the support of his child.

If the $1,250.00 bill was extortionate, the succeeding bills were even more so. There was no pretense at justification — simply a bald transmittal of ever-increasing dollar figures. No warning was given Malcomb; no conferences held; no attempt to itemize was made (except for the last bill in excess of $4,000.00 — which contained a major "error"). There is no evidence from Respondent whatever as to guidelines or standards for future bills except Respondent's testimony that "the total cumulative payment be determined at a future date." Malcomb was totally at Respondent's mercy. Respondent's mercy can be brutal and ruthless.

Respondent tried to exploit the fact that Malcomb accommodated Merle when she "backdated" their separation agreement one month. This was mendacious conduct on Malcomb's part and Respondent excoriated Malcomb. However, by the same token, Respondent too knew that the March 29, 1974 agreement was based upon a fraudulent date and he too did the same thing as Malcomb — he kept quiet. His testimony concerning this inaction is evasive and unconvincing. Apart from this, I find Malcomb's testimony truthful and credible. I believe him when he denied receiving any January 16, 1976 bill ("Further Retainer"). While I did not find Draper's denial [in the matter of his complaint against Kerpelman] (that he had received Respondent's June 23, 1976 bill) sufficient to overcome the presumption that he did receive it, that finding was based on the fact that the denial was by way of discovery in California

and Draper was not then present in Maryland to be viewed and questioned. In addition, there was some suggestion that Draper was under the influence of a drug, *compare U.S. v. Van Meerbeke,* 548 F.2d 415 (2d Cir. 1976) (defendant ingested opium in court — judge admonished for inaction). Here Malcomb *was* in court, he underwent a blistering and humiliating cross-examination by Respondent and maintained his composure and credibility.

I find by clear and convincing evidence that one of the prime motivations for Respondent's unwarranted, improper and unfair billing was anger. He testified before the Inquiry Panel that "I will show that client (Malcomb) who had filed this complaint against me, he can't get away with that and then I increased the *ad damnum,*" he testified he didn't like Malcomb (he is "universally disliked"); and "probably that I was angry at him." Anger should not be the basis for charging a fee to a client (nor the basis for a lawsuit against a former client). (Respondent was also inconsistent as when he asserted that "fee disagreements" should be settled by "impartial referees" and yet turns around and sues both Malcomb and Draper without any attempt at arbitration.)

In numerous respects, Respondent testified in an inconsistent and inaccurate manner. He called the Malcomb case a "junk case" but then realizing the danger of alluding to a custody case involving young children that way (to say nothing of charging $1,000.00 for a "junk case"), he quickly denied it was a junk case; he testified that one of the children testified as to the so-called nude bathing incident in court but this was not so and, in fact, the children were not even in court; he told *Malcomb* the decision of Judge MacDaniel was "entirely unreasonable and unfair" and suggested there should be a *formal hearing* as to child support but he told *Judge MacDaniel* that his decision (the judge's) was "entirely correct . . . aside from the support question which is, however, a relatively minor matter in the overall case, and, of course, a matter to which gentlemen may honestly differ"; he told Judge MacDaniel (by letter dated July 30, 1976) that the reason for his "slight delay" (in not sending Judge MacDaniel the proposed order) was "in order to have

(Malcomb's) decision in writing, I was taking the time to transmit to him and receive back the communications indicating he agreed with the support provision" whereas his letter to Malcomb asking for the written confirmation is dated *later* on August 3, 1976; and asserted that he had "purposely refrained from claiming that privilege (Fifth Amendment) . . . in his deposition" when he *did* so claim it as to his deposition ("I received a notice of deposition . . . and on the basis of *Spevack v. Klein* . . . I refused to be sworn . . . on the basis of the Fifth Amendment.").

## Conclusions of Law

### 1-102(A)(4)

**A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.**

I find the following by clear and convincing evidence: that Respondent represented to Malcomb that his total fee for his representation in the custody case would be $1,000.00 and no more but that in violation of his agreement, he charged (or attempted to charge) Malcomb fees over the agreed upon amount; that Respondent made a wilful misrepresentation to Malcomb as to his (Respondent's) fee; that Respondent maliciously and improperly escalated fee charges to Malcomb without any basis, without any agreement, without any warning; and without the escalated charges bearing any relationship to the amount of work done. Thus he has violated the above Disciplinary Rule.

As to Respondent's doing nothing to either advise Malcomb or the court of Malcomb's knowing acquiescence in Merle's backdating of their separation agreement, I am not convinced by clear and convincing evidence that Respondent furthered a fraud on the court.

## 1-102(A)(5)

**A lawyer shall not engage in conduct that is prejudicial to the administration of justice.**

I find by clear and convincing evidence that Respondent did improperly and consciously attempt to obtain legal fees from Malcomb; and did utilize the court system to knowingly and improperly attempt to obtain legal fees from Malcomb. Therefore, he has violated the above Disciplinary Rule since such condition is clearly prejudicial to the administration of justice. Respondent's conduct is inimical to justice.

## 1-102(A)(6)

**A lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law.**

I find by clear and convincing evidence that Respondent violated the above Disciplinary Rule by improperly attempting to obtain legal fees from Malcomb and by utilizing the court system knowingly and improperly to obtain unwarranted legal fees from Malcomb.

## 1-102(A)(1)

**A lawyer shall not violate a Disciplinary Rule.**

Because I have found by clear and convincing evidence that Respondent has violated above first three Disciplinary Rules, I find by clear and convincing evidence that Respondent has violated Disciplinary Rule 1-102(A)(1).

**Issue Two: Did Respondent violate any Disciplinary Rules by misrepresenting to Malcomb that his case was not yet resolved in the judge's mind (and could not have been) until the August 9, 1976 decree was signed and that he**

(Respondent) was working on the case (from July 20, 1976 on) when in fact, the judge's ruling was made on July 20, 1976, and the only matter remaining was the drafting and approval of the court-directed order; and Respondent was not working on Malcomb's case but rather trying to give the appearance of work in order to exact improper fees from Malcomb?

## Findings of Fact

The facts as found in Issue One . . . are also found as to this Issue.

Judge MacDaniel testified that he did "recall the case" and that the hearing date (as reflected from the file) was June 8, 1976. "Hearing and testimony was taken." He made a decision "when the case was over, that day." (June 8, 1976). The decision was "in accordance with the Decree that ended up being signed" (the August 9, 1976 decree awarding Heather to Merle; Kirsten to Malcomb; and requiring Malcomb to pay $25.00 per week as child support for Heather). He was requested by one of the attorneys to wait a period of time and allow the attorneys to come back and argue "or further discuss the case with me and I believe we even set a firm date . . . for them to come back. Whatever date that was I believe they did come in and I told them that, what my decision was, and told Mr. Hammond, I believe, to prepare a Decree, submit it to Mr. Kerpelman for approval as to form and then to the court and that I would sign it." He testified it was on July 20, 1976 and it was not a hearing but "just a kind of argument." He testified that he did receive a call from Malcomb and at first, refused to talk to him until he was "informed that he (Malcomb) only wanted to know when I was going to make up my mind and I then did talk to him . . . and I told him that I had made it up and . . . I was only waiting for the attorneys to send in the Decree so I could sign it." The judge testified that the reason he talked to

Malcomb was "... his comment was that I hadn't made a decision and I felt if I told him the decision had been made, that maybe he would go to his attorney or the other one and get the Decree in to me so I could sign it."

He had no recollection at all as to the matter of support in the July 20, 1976 conference. He testified that between July 20, 1976 and the time he received the Order to be signed, he "had no contacts with Respondent that he knew of."

Hammond testified that at the half hour conference on July 20, 1976, Respondent was upset at Judge MacDaniel's indication that he was going to award child support for Heather; that Judge MacDaniel asked me "to prepare an order commensurate with his decision;" that he did so and sent the proposed order to Respondent on July 22, 1976 for consent as to form ("if there are any questions, please so advise"); that Judge MacDaniel was firm in his July 20, 1976 position (Heather to Merle; Kirsten to Malcomb; $25.00 child support for Heather) and "that was his decision whether Mr. Malcomb agreed to it or whether he didn't, that was his decision;" that Respondent sent him a "temporary order" on July 1, 1976 which he (Hammond) refused to accept; and that from July 20, 1976 on (to the District Court case November 4, 1977), he had no other conversations with Respondent with regard to the case.

It is Malcomb's contention that the judge had clearly made a decision on July 20, 1976 and that Respondent knew it but tried to convince Malcomb that the matter was still unresolved. He and his wife Kathleen testified that they met Respondent at a FUER meeting on July 27, 1976 and Respondent told him he "was still working on the case" and that it was not settled. "Nothing is ever settled. It is still up in the air. It is touch and go. I have been meeting with the judge and trying to get it worked up. You know, judges are very reluctant to divide custody of children." It was also Malcomb's contention that divided custody was very much what he (Malcomb) wanted; that he was perfectly content to pay weekly child support of $25.00 for Heather; and that he had told this to Respondent repeatedly. Malcomb contended that when he discovered Respondent's brazen attempt to

string him along, he terminated his relationship with Respondent.

It is Respondent's contention that the order was not effective until it was signed; that despite Malcomb's willingness to pay child support, he was trying to convince him (Malcomb) not to accept the prepared order as to child support because of Merle's earning capacity and her marriage; that there was no such July 27, 1976 conversation with Malcomb at the FUER meeting; that despite Malcomb's having custody of Kirsten, this was not secure (because of Malcomb's past homosexuality); that he promptly informed Malcomb of the outcome of the July 20, 1976 hearing and that Malcomb considered the option (of contesting the award of support) for at least a week.

I find by clear and convincing evidence that Respondent deliberately withheld from Malcomb the decision of Judge MacDaniel on July 20, 1976; that he only submitted the proposed order to Judge MacDaniel on July 30, 1976 when he realized that Malcomb had found out about Judge MacDaniel's decision reached on July 20, 1976; and that he deliberately withheld the judge's decision in order to make it appear to Malcomb that he (Respondent) was still working on Malcomb's case in order to justify his "further" (and improper) fee.

Again, the evidence is overwhelming. I find as fact the following undisputed chronology of events:

1. **June 8, 1976** — It is undisputed that there was a hearing on this date; and that the judge stated at the end that the attorneys should let the situation remain status quo (Heather to stay with Merle; Kirsten to stay with Malcomb); that the attorneys should return in two weeks and at that time, he would make a determination; that Malcomb should pay child support for Heather; and *that he had made his decision (Heather to Merle; Kirsten to Malcomb and Malcomb pay $25.00* per week child support for Heather) on June 8, 1976 . . . .

2. **June 23, 1976** — Respondent bills Malcomb $650.00 for "Further retainer."

3. **July 1, 1976** — Respondent sends proposed Temporary Order to Hammond (Heather to temporarily remain in custody of Merle; Kirsten to temporarily remain in custody of Malcomb; support shall continue with payments to be made as heretofore). (Malcomb *had* been paying $25.00 per week for Heather's support).

4. **July 20, 1976** — Conference between Respondent, Hammond and Judge MacDaniel. The judge reaffirmed his previously reached decision and directed Hammond to prepare an order accordingly. He was firm despite Respondent's being upset about Malcomb being required to pay child support for Heather . . . .

5. **July 22, 1976** (Thursday) — Hammond sent proposed order to Respondent and Respondent "probably" received it on July 23, 1976.

6. **July 22, 1976** — Malcomb called Merle and Hammond . . . and ascertained that he (Malcomb) was to have custody of Kirsten and pay $25.00 child support for Heather; and Merle was to have custody of Heather.

7. **July 27, 1976** — Respondent tells Malcomb the case is still not settled; it is still up in the air; judges don't like divided custody . . . (while this matter *is* disputed, I find as a fact that it occurred).

8. **July 28, 1976** — Malcomb called Judge MacDaniel and ascertained same thing and also that the judge had made his decision on July 20, 1976.

9. **July 28, 1976** — Malcomb confronted Respondent with the above by telephone.

10. **July 28, 1976** — Respondent wrote Hammond he'll return the order as soon as he has had the opportunity to go over one or two matters with Malcomb.

11. **July 29, 1976** — Malcomb sent letter of termination to Respondent as result of Respondent's "brazen attempt to string me along *after* Judge MacDaniel had made his decision on July 20th."

12. **July 30, 1976** — Respondent sent proposed order to Judge MacDaniel (and signed it).

13. **August 3, 1976** — Respondent sent letter asking Malcomb to confirm in writing his consent to the child support requirement.

14. **August 5, 1976** — Respondent wrote Malcomb that the custody case is concluded "tenuously."

15. **August 9, 1976** — Judge MacDaniel signed order.

Malcomb's version is entirely credible; Respondent's is not. It is that simple. If Respondent promptly informed Malcomb of the outcome of the July 20, 1976 hearing, as Respondent says, then why would Malcomb call Merle? Or Hammond? Or Judge MacDaniel? Respondent offers no corroboration as to *his* "promptly" informing Malcomb whereas *Judge MacDaniel* testified that Malcomb *did* phone him and what is more, his (Judge MacDaniel's) version of the conversation is exactly the same as Malcomb's. Aside from corroboration, why would Malcomb *want* to call these people if Respondent had really told him about the proposed order. The decision was exactly what Malcomb wanted!

As to Merle having custody of Heather and Malcomb having custody of Kirsten, Respondent *knew* that was what Malcomb wanted. In fact, *Respondent* had written on January 7, 1976, *suggesting divided custody on behalf of Malcomb.* As to supporting Heather, Malcomb *had* been paying the weekly sum of $25.00 for Heather's support even *before* he consulted Respondent and he *told* Respondent he was quite content to continue to do so (his income was as follows: 1971 — $16,003.30; 1972 — $15,224.03; 1973 — $21,052.41 and 1974 — $21,707.43).

Respondent admits he *probably* received the proposed order from Hammond on July 23, 1976. So he had it in his possession from July 23, 1976 to July 30, 1976 (when he mailed the *agreed upon* order to Judge MacDaniel). Even before he received the proposed order from Hammond, he knew Judge MacDaniel's decision (having been informed of it at the July 20, 1976 conference). If he promptly advised Malcomb of that decision and if, as has been seen, the decision was precisely what Malcomb wanted, why would Malcomb write a letter of outrage to Respondent? Although

Respondent claims Malcomb was trying to avoid paying the $650.00 fee, I find conclusively that Malcomb was genuinely outraged and did not desire to bilk Respondent out of his fee. Malcomb had paid the $1,000.00 fee set by Respondent in accordance with Respondent's direction but when Respondent sent a bill contrary to their agreement, Malcomb balked and understandably so.

More to the point is that the actual decision was reached not on July 20, 1976 but on June 8, 1976. Judge MacDaniel testified that he *reached* the decision on June 8, 1976, repeated it on July 20, 1976 and ultimately signed an order embodying the same decision on August 9, 1976. While Respondent attempts to avoid the implications of this basic fact by a legal argument (that the decision did not become final until signed), that is beside the point. From a fact finding viewpoint, Malcomb's actions make sense, are consistent and are credible.

Respondent claims he not only promptly advised Malcomb to contest the oncoming child support order but requested that Malcomb consider this "option for at least a week before taking any action." But as seen before, why should Malcomb contest something that he favored? More interesting is the fact that Respondent had to explain why he kept the proposed order received by him for this one week (from July 23, 1976 to July 30, 1976). Respondent had to explain away that week. Respondent's claim that Malcomb was pondering and considering the simple matter of whether or not to support his child is simply not credible.

I find Malcomb's behavior consistent. Respondent's behavior, however, is not. If, as Respondent contended, he truly felt that Judge MacDaniel's proposed order was so "unreasonable and unfair," how does he explain the fact that from June 8, 1976 to August 9, 1976, he did absolutely nothing about it? He wrote no letters to Judge MacDaniel (nor to Hammond); he filed no motions and asked for no hearings. There was absolutely no *conduct* on his part to evidence such displeasure with the support phase of the upcoming order. On the contrary, he wrote Judge MacDaniel calling the support question "a relatively minor matter in

the overall case" and that gentlemen could differ. Even *before* the July 20, 1976 conference, the objective conduct of Respondent is consistent only with *acquiescence* in the support situation. Malcomb *had* been paying $25.00 per week for Heather's support, and on July 1, 1976, Respondent sent to Hammond a proposed temporary order (*prepared by Respondent*) proposing child support "as heretofore." Respondent tries to avoid the implications of his action by asserting a difference between temporary and permanent child support. Here again, this is beside the point. The question is what is the totality of the factual situation to a factfinder.

Respondent sent a $650.00 bill for "further retainer" on June 23, 1976. The word "retainer" is significant. If future work really had to be done, then the $650.00 bill would be justified at least in the sense of a fair bargain (work for money). But if there was no work to be done, then the bill would be totally unjustified. I find that there remained no substantial work to be done after July 20, 1976 and if there were, none was ever performed by Respondent. I find further (all by clear and convincing evidence) that Respondent deliberately intended to give Malcomb the impression that he (Respondent) was obliged to perform work on Malcomb's case when, in actuality, there was no work to be performed.

## Conclusions of Law

### 1-102(A)(4)

**A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.**

I conclude by clear and convincing evidence that Respondent deliberately misrepresented to Malcomb that there remained work to be done on his (Malcomb's) case and that he (Respondent) was actually engaged in performing such work, whereas, after July 20, 1976, there remained no work to be done and Respondent, in fact, performed no work and that this misrepresentation was made to justify an improper fee. I therefore find that he violated the above Disciplinary Rule.

### 1-102(A)(6)

**A lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law.**

I conclude by clear and convincing evidence that the aforesaid deliberate misrepresentations by Respondent constitute clear conduct that adversely reflects on his fitness to practice law. In addition, Respondent deliberately misrepresented to Judge MacDaniel in his July 30, 1976 letter that his delay in transmitting the proposed order was caused by his desire to have Malcomb's written agreement as to the child support provision (and to have Malcomb have enough time to be certain) whereas in fact Malcomb had not communicated his written agreement at the time Respondent sent the July 30, 1976 letter (nor after); and there was no need for Malcomb to so agree in writing since at all times Malcomb *had* agreed and Respondent knew it.

**Issue Three: Did Respondent violate DR 2-110(A)(2) by improperly withholding Malcomb's papers and the decree after being discharged by Malcomb; and by continuing to deal with Judge MacDaniel after he was discharged?**

I find no clear and convincing evidence that Respondent violated this Disciplinary Rule.

**Issue Four: Did Respondent violate DR 6-101(A)(2) by lack of adequate preparation in that he conducted no discovery, interviewed no witnesses before trial, called witnesses who were of little or no probative value, failed to call witnesses who were of probative value and generally displayed no knowledge of the facts surrounding the Malcomb case?**

The facts as found in Issues One and Two . . . are also found as to this Issue.

Bar Counsel asserts that Malcomb "wanted" both children — meaning custody of both. I do not agree. While Malcomb may have wanted custody of both at an earlier time, his final and steady decision was to obtain custody of Kirsten alone allowing Merle to have custody of Heather.

## Findings of Fact

The trial in question took place on June 8, 1976. It arose as the result of Merle's filing of a petition to modify the March 29, 1974 decree (which granted custody of both children to Malcomb). Malcomb's then attorney (Bartholomee) filed Malcomb's answer to said petition and also filed written interrogatories upon Merle. She filed her answer and also filed written interrogatories upon Malcomb. By this time, Respondent had replaced Bartholomee. Respondent filed a petition for "Immediate Return of Child" (Heather) and obtained a Show Cause Order (December 17, 1975). He also filed answers to Merle's interrogatories. (December 23, 1975). Respondent then issued a summons for witnesses (Malcomb's wife, Kathleen, Dr. Jane Mason, Sarah Fischer and Janet Slutter) together with subpoena *duces tecum* for Drs. G. P. Patton, Jane W. Mason, Harvey L. Saxton and Santiago Garza.

The trial took one day. Merle produced five witnesses and Respondent produced five also (including Merle as an adverse party). While Respondent filed no interrogatories, his predecessor (Bartholomee) did. Merle's answers provided the names of certain witnesses but Respondent never deposed nor interviewed them (except that he did summon Dr. Jane Mason, one of the witnesses listed in Merle's answers to interrogatories).

Prior to trial, Respondent did have one "formal interview" with Malcomb but he never interviewed any of Malcomb's witnesses until the day of trial. Nor did he depose anyone. This subjected him (Respondent) and his client to the same type of infirmities as mentioned previously . . . .

Respondent did hire one Mary Slicher (private social worker) to investigate. Bar Counsel feels that Respondent

failed to note the contents of her report as concerns Mr. and Mrs. Grabus which, Bar Counsel feels, adversely affected Malcomb. Yet paradoxically Bar Counsel downplays Ms. Slicher noting that Judge MacDaniel did not allow her to testify as an expert ("not to her experience but just observations") nor "was her report admitted into evidence."

What Bar Counsel perceives as inadequacy may well be trial tactics. For this reason and for the reasons outlined [previously], I do not find that Respondent violated DR 6-101(A)(2).